[No. B240227. Second Dist., Div. Five. Oct. 30, 2012.]

In re R.C. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
RODRIGO C., Defendant and Appellant.

**COUNSEL**

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and Emery El Habiby, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Rodrigo C., the father of three children, R.C., Michelle C. and Stephanie C., appeals from the juvenile court's jurisdictional and dispositional orders. The father argues there was insufficient evidence to support the juvenile court's

jurisdiction under Welfare and Institutions Code section 300, subdivision (b).[1] The father argues there was no evidence the children suffered any physical harm during the two domestic violence incidents between the parents. He also contends there is no ongoing domestic violence because he is complying with a three-year restraining order protecting the mother against him. We find sufficient evidence to support the allegation the father engaged in domestic violence such that there was a substantial risk the children would suffer serious physical harm. Accordingly, we affirm the jurisdictional and dispositional orders.

## II. PROCEDURAL HISTORY

On January 19, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of R.C., age 9; Michelle, age 6; and Stephanie, age 3. The section 300, subdivision (b) allegation which is at issue states: "On [January 13, 2012], the . . . father . . . engaged in a violent altercation in that the father repeatedly choked the mother. The father slapped the mother's face with the father's hand. The father pushed the mother, causing the mother to strike the mother's head against a wall. The father repeatedly pulled the mother's hair. The father grabbed and pulled the mother by the arm. The father pushed the mother into a couch. The father threatened to kill the mother. On a prior occasion, the father pushed the mother and grabbed the mother by the chest, inflicting a mark to the mother's chest. Such violent conduct on the part of the father against the mother endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger." The petition named Gabrielle T., the mother, and the father as parents of the three children. At the January 19, 2012 detention hearing, the juvenile court ordered the children detained at a shelter. The juvenile court also issued a temporary restraining order protecting the mother and children from the father. The father was granted monitored visits.

On January 25, 2012, the department was granted discretion to release the children to the mother once she found stable housing. The juvenile court again issued temporary restraining orders against the father on January 25 and February 6, 2012. At the February 24, 2012 adjudication hearing, the juvenile court ordered the children released to the mother. The department was ordered to provide them with family maintenance services.

On March 14, 2012, the juvenile court found the children were dependents of the court under section 300, subdivision (b). The juvenile court sustained

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

the following count in the section 300 petition: "On 01/13/2012, the [children's mother and father] engaged in a violent altercation in that the father repeatedly choked the mother. The father slapped the mother's face with the father's hand. The father pushed the mother, causing the mother to strike the mother's head against a wall. The father repeatedly pulled the mother's hair. The father grabbed and pulled the mother by the arm. The father pushed the mother into a couch. The father threatened to kill the mother. On a prior occasion, the father pushed the mother and grabbed the mother by the chest, inflicting a mark to the mother's chest. Such violent conduct on the part of the father against the mother endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger." The juvenile court sustained the allegations in the January 19, 2012 petition, finding the parents were involved in two domestic violence incidents. The children were ordered to remain in the mother's custody and the department was ordered to provide family maintenance services. But the children were removed from the father's custody pursuant to section 361, subdivision (c). The mother was ordered to attend classes on victims of domestic violence, parenting and individual counseling to address case issues. The father was ordered to attend domestic violence, anger management and parenting programs. In addition, the juvenile court issued a three-year restraining order protecting the mother from the father. The father was granted monitored visits in a neutral setting. That same day, the father filed his notice of appeal.

## III. EVIDENCE

### A. Detention Report

The January 19, 2012 detention report, which was prepared by a children's social worker, Arleen Vasquez, included a police report from the Hawthorne Police Department. On January 14, 2012, Ms. Vasquez met the mother and children at the family home in response to a referral from the police department. The mother stated she and the father had been having marital problems for about five months. The problems developed after the mother saw pictures of girls on the father's cell phone and confronted him about them. The mother reported the father became upset, pushed her and grabbed her chest leaving a red mark. The mother did not call the police or report the first incident because she did not want the children to be involved. The mother asked the father to leave the home and he complied.

According to the attached police report, on January 13, 2012, Hawthorne police officers arrived at the home after receiving a family disturbance call. Officer Eric Peraza interviewed the mother in Spanish. The mother told Officer Peraza the father had called her earlier that day and inquired if she was home. The father told the mother he knew she was not home and asked if

she was with someone. She replied that a male friend had accompanied her to inquire about getting a divorce. The mother reported the father threatened to kill her and her male friend. The mother asked a neighbor to pick up the two oldest children from school. The mother knew the father was upset.

Five minutes after the mother returned home, she heard someone knock on her front door. She opened the door and the father immediately grabbed her hair with his hand. The father pulled the mother by the hair toward the couch and forced her onto the couch. He held the mother down on the couch with his body. The father continued to grab the mother's hair with one hand and began choking her with his other hand. The mother pleaded with the father to let her go. As the father kept her down, he stated: "I am going to kill you. Why do you do this to me?" The mother responded she was not doing anything wrong. The father then said, "Wherever I see you or him, [I'm] going to kill him!" The father then slapped the mother on the right side of her face. The mother tried to get up but the father placed his hand over her face and forced her back onto the couch.

The mother later escaped from the couch and ran towards the open front door. The father got in front of the mother and blocked her from leaving the apartment. He grabbed the mother's hair with both hands and forced her towards the north living room wall. The father then pushed the mother causing her to hit her head and back against the wall. The father's cell phone rang and he answered the phone. The father yelled on the phone, "Bring me the gun because I am going to kill her!" The mother heard the caller reply, "The police are going to come, don't do that!" The mother believed the caller was the father's brother.

While the father was talking on the cell phone, the mother was able to get away from him. She ran out the apartment door and yelled across the courtyard for her neighbor to call the police. The father stepped outside the apartment and pulled the mother back into the apartment by grabbing her right arm. He told the mother, "This is not going to stay like this; wherever I see you I'm going to kill you!" The mother told him she was going to call the police this time. The father then left the apartment. The mother told Officer Peraza she believed the father was capable of carrying out the threat to kill her.

Besides interviewing the mother, Ms. Vasquez also interviewed the children. Nine-year-old R.C. told Ms. Vasquez he was not home at the time of the January 13, 2012 incident. R.C. said that the mother related that the father choked her and asked for a gun to shoot her. R.C. was afraid of his father. Six-year-old Michelle only heard what happened. Michelle heard the father choke the mother and ask for a gun from someone downstairs. Michelle stated she

heard her parents argue but she had not seen or heard anything else. In Ms. Vasquez's view, three-year-old Stephanie was too young to make any meaningful statement. During the interview with Ms. Vasquez, the mother received a telephone call from the father. The mother handed the phone to Ms. Vasquez. When Ms. Vasquez identified herself, the father hung up.

Ms. Vasquez made arrangements for the mother and children to be driven to a secure location. About an hour later, the mother called and left a message for Ms. Vasquez. The mother said she was going to go to San Francisco instead of the shelter. The mother did not provide a full address of where she would be staying in San Francisco. The department decided to place the children in protective custody because the mother failed to comply with the safety plan by not going to a shelter; the father had threatened to kill the mother and take the children to Mexico; and the father's whereabouts were unknown at the time.

### B. Jurisdiction/Disposition Report

The February 10, 2012 jurisdiction report was prepared by another children's social worker, Pearl Rodriguez. Ms. Rodriguez interviewed the children privately at their foster home on January 26, 2012. R.C. stated: "My dad was not living with us anymore. My mom got mad at my dad because she found a picture of a girl on his cell phone. First she came to ask me if I had put the picture of the girl in the phone because sometimes I use it to call my friends, but I told her it wasn't me. She asked my dad about it and they started fighting, but with words. My dad threw the phone from my mom's hands and it hit the floor. My mom told me and my sisters to go to the room and we did. My mom started crying and told him to leave the house. My dad told her that he didn't want to end things that way, but she told him that if he didn't leave then we would leave. I didn't see my dad hit my mom that day and my mom didn't hit him. [¶] My dad went to live with my uncle, but he would come and pick us up on Sundays and take us to eat and to his house. It was fun. We would go eat or play soccer."

Concerning the January 13, 2012 incident, R.C. stated: "You are talking about the day that my dad told my mom that he was going to kill her. I didn't see what happened because I was playing by the manager's house. Me and Michelle were playing at the manager's house, but Stephanie was with my mom when it happened. I didn't hear anything, but I know what happened because my mom told me. She was afraid of my dad because he pushed her against the wall and told her that he was going to kill her with a gun. The night that it happened, we stayed at my mom's friend's house because my mom was scared of my dad." R.C. stated he never saw a gun. But R.C.

believed the uncle owned a firearm. R.C. was frightened when the mother described the father's effort to kill her. R.C. did not want anything to happen to the mother.

Michelle stated: "My dad was living with my cousin Lupe because my mom was mad at him. She was mad because one time she found a picture of a girl on his phone. She asked me and my brother if we had put the picture on the phone, but we didn't. When my dad got home, she asked him who the girl was. He told her that it was no one and he told her sorry. They were kind of screaming, but not really. My mom told him that he better leave or else we were going to leave. He was mad and he threw the phone on the floor. [¶] . . . My dad had two other girls plus my mom so that makes three girls. My mom would get mad because he had three girls. [¶] My dad would come and visit us. He would take us to eat or to the park. [¶] . . . [¶] My dad was nice to us, but he was mean to my mom. He was mean because that time that my mom found the picture, he picked her up and he wanted to hit her, but he didn't. He just acted like he was going to hit her." As for the January 13, 2012 incident, Michelle stated the mother had related what happened. She and her brother did not see the altercation. This was because they were playing at the apartment manager's home. Michelle was "scared" because R.C. said the father was going to kill the mother with a gun.

Stephanie was shy and smiled or giggled when Ms. Rodriguez tried to speak with the youngster. During the interview, Michelle came into the room and told Stephanie to tell Ms. Rodriguez about a domestic violence incident. On that occasion, Stephanie observed their father hit their mother. Stephanie stated, "Mi papi le pego a mi mami" (my father hit my mom). Stephanie insisted on playing with Michelle and did not provide any more detail about the January 13, 2012 incident.

Ms. Rodriguez also interviewed the mother. Concerning the January 13, 2012 incident, the mother stated: "On that day, I had an appointment with an attorney because I was looking to divorce [the father]. We had been having lots of problems and I knew that I didn't want to be married to him anymore. I did not have a ride so I asked a friend to take me. I don't know how [the father] found out that it was a male friend, but he did. As we were driving home I received a call from [the father]. He told me that he knew I was with a man and then he threatened to kill me and my friend. I asked my friend to drop me off at home. Michelle and [R.C.] were at the manager's house, Rosario, because she had picked them up from school and Stephanie was with me. First I stopped by to check on the kids and I asked Rosario if she could keep an eye on them for a little longer. I had a feeling that [the father] would come and I just did not want them to see us argue. Stephanie didn't want to stay with Rosario so I agreed to take her upstairs. She wanted to go

to the bathroom so I thought I would take her and my plan was to bring her back to Rosario's, but as Stephanie was in the restroom I heard a knock on the door. I thought it was probably [R.C.] so I opened the door and [the father] rushed into the house."

The mother further reported: "[The father] started arguing with me and asking me who I was with. He slapped me on the face and pulled my hair and pushed me to the couch. At this point, I remember that Stephanie ran out of the restroom and out the front door. I pleaded for him to stop, but he pushed me against the wall like three times and that was how I hit my head against the wall. I am not sure if I had any bumps on my head, but it did hurt me. I somehow managed to run out of the door, but as I was running out he pulled me by the hair. Then, his phone rang and he picked it up. I don't know who called him, but he told the person to bring a gun because he was going to kill me. I was able to free myself as he was on the phone and I ran out again and yelled for someone to call 911 and that was when he pulled me back in and told me that I should not have done that. He told me he was leaving, but that wherever I was, he was going to find me and kill me."

The mother also described the prior domestic abuse incident: "There was only one other time that he put his hands on me. It was not as bad. The children were inside and did not see it. It happened about two months ago. He was not living in the home at this point. He came to drop off some money for groceries and we were talking outside by his car. My therapist, Araceli, had talked to me about asking [the father] to take the children on the weekend so that I can have some time for myself. When I mentioned it to [the father], he became upset. He grabbed me by the chest and pushed me against the car and told me that he would not take the kids on the weekend because he knew that I probably just wanted to go out. He also grabbed and tore the visitation plan that my therapist helped me write. I told him that I would call 911 and he said that he would call immigration. I could not believe that things could have escalated to that point. I never kept him from his kids. If there is one thing that he did right, it was taking care of his kids. The kids loved him."

In addition, Ms. Rodriguez interviewed the maternal great-aunt, Josephina Ceja. Ms. Ceja offered to provide housing for the mother and children. Ms. Ceja stated: "I welcome [the mother] and her children into my home. I have always maintained a good relationship with [the mother]. Even prior to this incident, she knew that she and the children were always welcomed. I was not aware of the degree of conflict between [the father] and [the mother], but I am confident that she can get on her feet with our help. There is a school nearby where the children can attend and we have a room where she and the children can sleep."

The father was interviewed by Ms. Rodriguez on February 6, 2012. He denied abusing the mother: "I have no idea what is going on. Everything that is being said about me is a lie." The father declined to talk about the January 13, 2012 incident: "I cannot discuss the details of that day. My attorney asked me not to talk to anyone about it. But it's all a lie and I cannot understand why [the mother] is saying all those things."

When asked about prior domestic violence incidents, the father stated: "Things were good between us, but someone started sending [the mother] anonymous emails. The emails reported that I had been married in the past and that I have never properly ended the marriage. I don't know who was sending that stuff, but none of it was true. [The mother] started acting differently and being more suspicious. [¶] Sometime in November 2011, [the mother] found a picture of a woman in my phone. The picture was actually of her. It was a blurry photo because the camera must have moved when the picture was taken. The kids play with the phone sometimes and they probably took the picture. She thought it was another woman, but it was her. She continued to question me. I became upset and threw the phone on the floor. The kids were there when it happened, but it was not a violent argument. She asked me to leave and I agreed. . . . [¶] I continued helping her with the rent and groceries because she didn't work. I would pick up the kids and take them to eat. Sometimes she would come along. We rarely argued in front of the kids."

In response to Ms. Rodriguez's inquiry about the mother's chest injury, the father stated: "I know what you are referring to, but I did not intend on hurting her and I still don't understand how she had redness on her chest. [¶] I had come over to drop off some money for groceries and we started arguing about the kids and she wanted to leave. I put my hands out near her chest to tell her to wait, but I did not grab her, scratch her, or hurt her. Later on she sent me a picture of her chest and it was red. She told me that I had caused the redness, but I could not believe it because I only rested my hand on her chest. The kids were not present during the incident because they were inside the house and this happened in the car outside." The father denied he threatened the mother. He stated he did not "have a major problem in controlling [his] anger" but admitted sometimes he got "easily agitated."

Ms. Rodriguez also interviewed an investigator identified only as Detective Espinoza from the Hawthorne Police Department about the criminal investigation. Detective Espinoza stated the father was arrested on January 31, 2012 for making criminal threats to kill the mother; false imprisonment for not allowing the mother to leave the residence during the altercation; and engaging in domestic abuse. The father went to the police station with an attorney and was released on bail the same day.

Attached to the jurisdiction/disposition report was a multidisciplinary assessment team analysis. According to the assessment: "[The mother] seemed centrally focused on getting out of her relationship with her husband and protecting her children from further exposure to violence. [The mother] reported that for over a year the couple was having marital difficulties because the father was receiving text messages from other women and had some heated arguments. [R.C.] had become aware that the father was becoming verbally abusive and had once gripped the mother's clothing with force and broke a cell phone in rage. The mother dismissed the incidents and tried to avoid having the children exposed to the arguments, but [R.C.] was aware of the conflicts between the parents." As to Michelle, the report states, "She was observed struggling to cope with the familial conflicts that placed her in foster care and was in need of further mental health services to avoid further deterioration of symptoms."

As for Stephanie, the report noted Stephanie showed the least reservation toward the father and embraced him fully during a visit. But the report stated: "[The mother] reported that [Stephanie] did witness the incident that led to the detention and called on the father to stop hurting [the mother] and tried to comfort [the mother] afterwards. Stephanie apparently internalized the incident such that she later told [R.C.] that [the father] had hit [the mother]. Ironically, in the interactions with her siblings, she was the one that spoke the least about the incident. Exposure to a traumatic event as the one described in the records and the mother require further exploration. Stephanie was showing a lack of coping skills in dealing with familial conflicts that placed her in foster care and was in need of further mental health services to avoid further deterioration of symptoms."

The department recommended the juvenile court declare the children dependents of the court. Ms. Rodriguez wrote: "The mother and father denied a history of domestic abuse violence and it appears as though their marital conflict began and quickly escalated during the past year. Although the mother and father were able to agree that it was best for the father to leave the home, the incident that occurred on [January 13, 2012,] is indicative of the continued breakdown in healthy communication and escalating violence. If the parents do plan to continue the divorce, it is important for them to learn healthy conflict resolution skills in order to promote a peaceful and loving environment for their children. The father and mother have both expressed their desire to comply with the Court and [department] recommendations."

### C. Jurisdiction/Disposition Hearing

At the March 14, 2012 jurisdiction/disposition hearing, the juvenile court admitted into evidence the January 19, 2012 detention report and attachments; the February 10, 2012 preresolution conference report; and the

January 25, February 10 and 24 and March 14, 2012 last minute information to the court documents and their related attachments. The juvenile court then heard testimony from the parents. The father denied hitting the mother. He testified he choked the mother to defend himself but could not explain why he was afraid of her. The father admitted Stephanie saw him choke the mother. He denied ever asking for a gun or threatening to kill the mother.

The mother testified the father attacked her on January 13, 2012. She denied attacking the father. The mother also testified in October 2011, she asked the father if he could stay with the children for at least a weekend. This was because she was tired. The father did not agree and grabbed her near the neck leaving a mark.

After testimony, counsel for the mother and children joined the department in arguing for juvenile court jurisdiction over the youngsters. The father argued dependency court jurisdiction was unnecessary. After argument, the juvenile court sustained the section 300 petition.

The juvenile court explained: ". . . This is the first that I've heard that there was any type of self-defense. It's sort of hard to figure out how there could be self-defense when the father came to the mother's home as opposed to vice versa. [¶] Secondly, the incident as set forth in the police report, the reports from the department, and the child Stephanie as best we can understand, indicate that domestic violence did occur. There's no question about it, whether it was—even if it was instigated by the mother, which I don't find that it was. There was at least one incident in the past of hands being laid on. [¶] This is a family that's disintegrating. Emotions are running high, and all of our training and experience and the evidence tells us that, from the standpoint of this family, [father's counsel] is right. This is not an ongoing situation in which the family's remaining together. However, they still have three children together. They're still going to be interacting with each other. And without either a restraining order or court intervention, there really isn't anything at this particular point, to ensure that the children are protected, which is what we're about. And I think we can do that by providing services to the parents so that they can get along. And then we won't have any more of these incidents. Because there are child support issues. There are issues of visitation. And the parents are going to have to work that out so that we don't have another incident like this. There appears to be jealousy on both sides."

## IV. DISCUSSION

### A. Standard of Review

We review the juvenile court's jurisdictional findings and orders for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574–575 [109

Cal.Rptr.3d 1]; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433 [95 Cal.Rptr.3d 235].) Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value. (*In re E.B., supra*, 184 Cal.App.4th at p. 575; *In re J.K., supra*, 174 Cal.App.4th at p. 1433.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court. We adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 [32 Cal.Rptr.3d 526]; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 [135 Cal.Rptr.2d 72].)

### B. Jurisdictional Finding Under Section 300

■ Section 300, subdivision (b) states: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately . . . protect the child . . . ." Section 355, subdivision (a) provides: "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300. . . ." To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that there was neglectful conduct by the parent in one of the specified forms; causation; and " 'serious physical harm or illness' " to the child or "substantial risk" of such harm or illness. (*In re Veronica G.* (2007) 157 Cal.App. 4th 179, 186, fn. 4 [68 Cal.Rptr.3d 465]; *In re Ricardo L., supra*, 109 Cal.App.4th at p. 567; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].)

■ Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b). Our colleagues in Division One of this appellate district have thoroughly explained the relationship between section 300, subdivision (b) and domestic violence: " '[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [60 Cal.Rptr.2d 315].) Children can be 'put in a position of physical danger from [spousal] violence' because, 'for example, they could wander into the room where it was occurring and be

accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' (*Ibid.*)" (*In re E.B., supra*, 184 Cal.App.4th at p. 576.) Further, our Division One colleagues noted: " 'Both common sense and expert opinion indicate spousal abuse is detrimental to children.' (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5 [278 Cal.Rptr. 468]; see *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [64 Cal.Rptr.2d 93]; Fields, *The Impact of Spouse Abuse on Children and Its Relevance in Custody and Visitation Decisions in New York State* (1994) 3 Cornell J.L. & Pub. Pol'y 221, 228 ['Studies show that violence by one parent against another harms children even if they do not witness it.']; Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions* (1991) 44 Vand. L.Rev. 1041, 1055–1056 ['First, children of these relationships appear more likely to experience physical harm from both parents than children of relationships without woman abuse. Second, even if they are not physically harmed, children suffer enormously from simply witnessing the violence between their parents. . . . [¶] Third, children of abusive fathers are likely to be physically abused themselves.' (Fns. omitted.)].) [¶] Father's past violent behavior toward Mother is an ongoing concern. '[P]ast violent behavior in a relationship is "the best predictor of future violence." Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of these relationships. . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner.' (Comment, *Beating Again and Again and Again: Why Washington Needs a New Rule of Evidence Admitting Prior Acts of Domestic Violence* (2000) 75 Wash. L.Rev. 973, 977–978, fns. omitted.)" (*In re E.B., supra*, 184 Cal.App.4th at p. 576.)

The father argues the department failed to prove the two incidents of domestic violence between the parents placed the children at substantial risk of physical harm or illness. The father admits Stephanie was present during the January 13, 2012 incident but asserts R.C. and Michelle were not exposed to the parents' conflicts. During the adjudication hearing the father conceded Stephanie saw portions of the January 13, 2012 incident. Despite Stephanie's presence at the January 13, 2012 incident, the father argues she "showed the least reservation toward him and embraced him fully," referencing the multidisciplinary assessment team summary of findings.

The father's arguments are unpersuasive. There is substantial evidence to support the juvenile court's jurisdictional findings. On another occasion, the father grabbed the mother and broke her cell phone. The father first injured the mother, leaving a red mark on her chest, during a domestic violence incident that occurred in October 2011. Three months later, the father again

injured the mother on January 13, 2012. On that day, the father went to the mother's home. The father had learned she had been in a car with a male friend. The father grabbed the mother's hair, forced her onto a couch and choked her. The father also slapped the mother on the right side of her face and pushed her, causing the mother to hit her head and back against a wall. The father ignored the mother's pleas to let her go and threatened to kill her. The father also threatened to kill the mother's male friend. The father spoke to the paternal uncle on a cell phone. The father told the paternal uncle, "Bring me the gun because I am going to kill her!"

The January 13, 2012 domestic violence incident occurred in the presence of three-year-old Stephanie. According to the multidisciplinary assessment team report, "Stephanie apparently internalized the incident such that she later told [R.C.] that [the father] had hit [the mother]." Stephanie related the same incident to Ms. Rodriguez who wrote the jurisdiction/disposition report. The father refers to the multidisciplinary assessment team report of Stephanie's interaction with him during a visit to argue Stephanie was unaffected by the domestic violence. But that same report states, "Stephanie [showed] a lack of coping skills in dealing with familial conflicts that placed her in foster care and was in need of further mental health services to avoid further deterioration of symptoms." The mother reported Stephanie, who had been in the restroom before the father came to the home, ran out of the bathroom and out the open front door during the violent altercation. While Stephanie was not physically hurt, she was unsupervised during the violent altercation and ran out the front door unattended. The foregoing constitutes substantial evidence which supports the section 300, subdivision (b) finding.

The father argues this case is similar to *In re J.N.* (2010) 181 Cal.App.4th 1010, 1014 [104 Cal.Rptr.3d 478] and *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716–717 [120 Cal.Rptr.3d 709], where the appellate courts reversed jurisdictional orders under section 300, subdivision (b). The father's reliance on both cases is misplaced. In *J.N.*, the parents were incarcerated after the father while intoxicated drove the mother and three children home from a restaurant. (*In re J.N., supra*, 181 Cal.App.4th at pp. 1015–1016.) The mother was also drunk. (*Id.* at p. 1017.) The father crashed his car into another automobile and then into a city light pole. (*Ibid.*) Two of the children suffered injuries as a result of the crash. (*Ibid.*) The parents expressed remorse and indicated they had learned from their mistakes. (*Id.* at pp. 1017–1018.) The parents and the oldest child, an eight year old, reported the parents did not drink much. (*Ibid.*) According to the eight-year-old child, the mother drank a beer once in a while and the father drank one or two beers a couple times per month. (*Id.* at 1017.) The appellate court reversed the jurisdictional order

under section 300, subdivision (b). The Court of Appeal reasoned neither parent had an ongoing substance abuse problem that put the children at risk of serious physical harm. (181 Cal.App.4th at p. 1026.) And the father reasons the threat to the children's safety in *J.N.* was greater than here; here, he never struck any of the three children; and in *J.N.*, the father argues, the three children easily could have been killed. No review petition was filed in *J.N.*

In the case of *In re Daisy H., supra,* 192 Cal.App.4th at page 717, the father choked and pulled the mother's hair two or seven years before the dependency petition was filed. The children denied ever seeing domestic abuse and there was no evidence the alleged hair-pulling and choking incidents occurred in the children's presence. Further, none of the children in *Daisy H.* expressed any fear of the father. (*Ibid.*) The Court of Appeal found the evidence was insufficient to support the finding the prior act of domestic violence placed the children at a current substantial risk of physical harm. (*Ibid.*) The appellate court stated, "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing and likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*Ibid.*) No new petition was filed in *Daisy H.*

The present case involves materially more aggravated facts than in *J.N.* and *Daisy H.* This case does not involve a single act which endangers a child. Rather this case involves two separate acts of domestic violence; repeated threats to kill the mother; a threat to take the children to Mexico; domestic violence in the presence of one of the children; and one of the children, R.C., being afraid of the father. By contrast, *J.N.* involved one act of driving under the influence of alcohol and a single ensuing accident. There was, in the opinion of the Court of Appeal, no evidence of an ongoing substance abuse problem. *Daisy H.* involved either a two- or seven-year-old single act of domestic violence. None of the children in *Daisy H.* had witnessed the single act of domestic violence. According to the Court of Appeal in *Daisy H.*, the fact the parents were separated indicated there was no risk to the children. In this case, the parents were separated prior to the January 13, 2012 attack and threats to kill. Here, there is substantial evidence the parents' separation did not diminish the risk to the three children (as well as to the mother). The juvenile court had jurisdiction over the children under section 300, subdivision (b) because of the domestic violence perpetrated by the father. (*In re E.B., supra,* 184 Cal.App.4th at p. 576; *In re Heather A., supra,* 52 Cal.App.4th at p. 194.)

## V. DISPOSITION

The jurisdictional and dispositional orders are affirmed.

Armstrong, J., and Kriegler, J., concurred.