Filed 7/24/14  In re L.Y. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re L.Y. et al., Persons Coming Under the Juvenile Court Law. | B253143<br>(Los Angeles County<br>Super. Ct. No. DK01670) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>CRYSTAL J.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Veronica McBeth, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kim Nemoy, Principal Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, Crystal J., appeals from an order removing her son, Aaron L., from her custody. Aaron's sister, L.Y., was removed from the mother's custody. L.Y. was removed from the mother because of physical abuse. Aaron was removed from the mother's custody because he was at substantial risk of harm based on his sister's physical abuse. The mother does not challenge L.Y.'s removal. However, the mother argues the grounds for removing Aaron were not present. We affirm the juvenile court's order.

# II. BACKGROUND

## A. Procedural Matters

On October 8, 2013, the Los Angeles County Department of Children and Family Services (the department) filed a Welfare and Institutions Code section 300[1] petition. The department alleges that: the mother struck L.Y. with a cord; L.Y. was struck on her arms, inflicting linear marks and a bruise to her forearm; L.Y. was struck on her back, buttocks and legs with a cord, inflicting linear marks on her back and legs; and on numerous occasions the mother struck the child with hangers and cords. The department alleges L.Y. was afraid of the mother. This fear emanated from the mother's physical abuse of L.Y. The department also alleges the abuse endangered L.Y.'s health and put Aaron at risk of physical harm, damage, danger and abuse. The department alleges the children's maternal grandmother, A.M., abused L.Y. According to the petition, A.M. pulled on L.Y.'s ears. Also, L.Y. was struck on the head by A.M. The department further alleges the physical abuse of L.Y. by the mother and maternal grandmother put Aaron at substantial risk of similar abuse.

---

[1] Further statutory references are to the Welfare and Institutions Code.

At the October 8, 2013 detention hearing: J.Y. was found to be the presumed father of L.Y.; Sean L. was found to be the presumed father of Aaron; both children were ordered detained; and the juvenile court found substantial danger existed to the children's health. On November 4, 2013, the department amended its petition which alleges: on October 1, 2013, the mother had used inappropriate physical discipline leaving marks on L.Y.'s arms; on a prior occasion in September, the mother struck L.Y.'s back, buttocks, and legs with a cord; the mother and Sean had engaged in physical altercations; and on April 5, 2012, they shoved each other and Sean pushed and struck the mother.

On November 20, 2013, the juvenile court held the jurisdiction hearing. The juvenile court sustained count A-1, concerning the mother's physical abuse of L.Y. placing both minors at risk of physical harm. Also, the juvenile court sustained count B-3, concerning the mother's failure to protect the children from the violent altercations involving her and Sean. The remaining allegation was stricken. The juvenile court removed the children from the mother's custody and ordered family reunification services for the parents. The mother subsequently appealed the juvenile court's jurisdictional and dispositional findings.

## B. Factual Matters

### 1. October 8, 2013 detention report

L.Y. was 11 years old and Aaron was 11 months old. The social worker reported she received a referral on October 3, 2013. The allegations indicated the mother had physically and emotionally abused LY. LY. said she was afraid of getting a "whooping" for being late after a tutoring session. The mother allegedly struck L.Y. with a cord. The referral further stated the mother called L.Y. stupid, a troll and ugly.

The social worker interviewed the mother concerning the allegations. The mother said all the allegations were lies. The mother stated L.Y. was always lying and denied using a cord, belt or anything else. The mother took L.Y. for a physical last month. The

3

doctor did not notice any marks on L.Y., according to the mother. According to the social worker, "The mother stated that sometime in September she did 'pop' [L.Y.]." The mother hit L.Y. on the buttocks with an open hand. This occurred while L.Y. was clothed. The mother stated she was aware of the physical discipline laws and that she knew she was permitted to do this as a form of discipline. During the month preceding the precipitation of the detention report, the mother took L.Y.'s phone away. This occurred after L.Y. was talking to strangers and arranging to meet with them on Facebook. The mother stated the linear marks on L.Y.'s hands were flea bites. The mother said the linear mark on L.Y,'s lower back was actually a birth mark. The mother denied calling L.Y. ugly, a troll or stupid.

The social worker met L.Y. at school. L.Y. remembered meeting the social worker a year earlier when the mother got into a fight with Sean. L.Y. stated three weeks ago she was hit with a cord that the mother connected to her car to listen to music. The mother had asked L.Y. to bring Aaron's bottle. L.Y. asked which one. The mother responded that L.Y. was in special education and stupid. According to the social worker, "[L.Y.] stated that she asked her mother which bottle to bring because she knew she was going to be hit if she brought the wrong one but it didn't matter that she asked because her mother hit her anyway."

During the interview, L.Y. displayed a circular dark mark on her right forearm which she claimed occurred when the cord hit her in the same spot twice. The social worker described the mark as having a slight discoloration. L.Y. stated she was hit on the arms and back with the cord. L.Y. indicated two months ago the mother's belt broke. Then the mother began using the cord to administer discipline. L.Y. stated two months ago she was hit on her unclothed buttocks five times. L.Y. stated it hurt to sit down after being hit.

L.Y. said she was called ugly and a troll. At another point, the social worker wrote: "[L.Y.] stated that her mother [says] . . . she is going to put her on a 'plain yellow bus' and 'put me up for adoption.'" L.Y. stated that two days ago she went to afterschool tutoring and was late coming out. The mother "whooped" L.Y. for being late. L.Y. was

4

hit with a cord on the arm. L.Y. showed the social worker a linear mark. The mark was on L.Y.'s left forearm that was lighter in pigmentation. L.Y. was eating canned fruit and accidentally cut her finger on the can top. L.Y. stated she had to go to the doctor for stitches. The mother called L.Y. stupid when it happened. The social worker also wrote: "[L.Y.] stated that her mother has also hit her with a hanger on her head and arm two weeks ago because she couldn't find her c[]ord. [L.Y.] stated that her mother kicks her on her back to wake her up every morning."

L.Y. lived with the mother, Aaron, a maternal grandmother, a great-grandmother and two aunts. The grandmother would sometimes hit L.Y. with an open hand on the head. According to the detention report, "[L.Y.] stated that she does not feel safe with her maternal grandmother or Aunties because they've all seen her mother put her down or have heard the mother hit her and they don't do anything. . . . [L.Y.] stated she is afraid that her mother will whoop her today after [the social worker] leaves and stated she is afraid to go home tonight." L.Y. was afraid she would be hit after the interview ended. The mother did not hit Aaron. But L.Y. stated she was afraid for Aaron's safety. The only time the mother did not call L.Y. mean names was when they lived with Sean. A forensic exam on L.Y. indicated physical abuse. Sean said he was arrested in 2012 for domestic violence. He indicated he was taking domestic violence classes. The social worker recommended monitored visits in a neutral setting for the mother. The social worker concluded L.Y.'s safety was a concern and there was a substantial risk of abuse as to Aaron.


2. October 8, 2013 addendum report


The social worker recommended the mother and Sean participate in individual and family counseling and parenting and anger management classes. She also recommended Sean participate in a domestic violence program. L.Y.'s father, J.Y., could not be located due to lack of identifying information.

5

### 3. November 4, 2013 jurisdiction/disposition report

The dependency investigator noted the children were placed with different foster parents. Sean had been placed on three years' probation for misdemeanor false imprisonment and ordered to complete 52 weeks of domestic violence for perpetrators and anger management classes. On October 23, 2013, L.Y. was reinterviewed. L.Y. provided additional information concerning being hit by the mother. The dependency investigator also interviewed the mother. The mother denied all the allegations.

Concerning the April 2012 domestic violence incident, the mother reported Sean had the music on too loud. Sean's brother was also present and was implicated in the music incident. She had to get up early to work the next day. The mother told them to turn the music down. The next morning Sean and the mother got into another argument which became physical. She stated Sean threw her to the ground and choked her. The mother called the police and they arrested him. The mother stated she got a restraining order against Sean. The mother wanted L.Y. to receive therapy to learn to stop telling lies.

On October 29, 2013, the dependency investigator interviewed Sean. He reported witnessing the mother hit L.Y. on numerous occasions while he lived in the home. Sean explained the mother had serious anger issues. When asked if he intervened during the beating, he stated, "No." The jurisdiction/dependency report states: "The [dependency investigator] asked [Sean] why he wouldn't intervene. [Sean] stated the mother is mean and if he tried to stop her from hitting [L.Y.] she would go after him. The [dependency investigator] asked [Sean] what he did when he saw the mother hitting [L.Y.]. [Sean] said, 'Nothing.'"

Sean stated the domestic violence charge was dismissed but he pled guilty to misdemeanor false imprisonment. Concerning the incident, he explained that one evening the television was too loud and the mother became upset. She waited until 5 a.m. the next morning and then started walking into all the bedrooms banging a pan, waking everybody up. Sean stated he tried to stop her by taking the pan away. They

scuffled and she scratched him on his arm and neck. Sean denied the mother had any marks on her. Sean stated he moved out because the mother was crazy. The social worker recommended L.Y. and Aaron be declared dependents and their custody taken away from the parents. The social worker also recommended the mother receive monitored visits, complete anger management, parent education and parenting classes, and receive individual therapy.

### 4. November 20, 2013 addendum report

The social worker reported on the progress of the visits. The mother was scheduled to visit Aaron and L.Y. for two hours on Wednesdays at the department's office. On October 30, 2013, the mother and L.Y. talked while playing with Aaron and helping him learn to walk. The social worker noted the whole family was engaging with each other.

During the November 6, 2013 visit, the social worker observed the mother and L.Y. joking together. However, L.Y. was doing most of the talking. The relationship appeared to be more like friends than mother and daughter. L.Y. tried to give the mother a hug when the visit ended. But the mother was not receptive and did not turn around when L.Y. called out goodbye. L.Y. reported feeling sad because the mother was missing all of Aaron's firsts like his birthday and taking steps. During the November 13, 2013 visit, the social worker observed L.Y. engaged with Aaron throughout the visit. The mother engaged with Aaron by helping him walk and changing his diaper. L.Y. talked with the mother about cheerleading. L.Y. again tried to hug her but the mother did not engage. Overall, the interactions were deemed appropriate.

### 5. November 20, 2013 jurisdiction and disposition hearing

The mother testified her relationship with L.Y. was fine. The mother testified any spanking occurred with L.Y.'s clothes on and there were no marks or bruising. The

7

mother denied ever hitting L.Y. with a cord or inflicting linear marks. The spankings resulted from L.Y. being in trouble at school and "talking" on Facebook with strangers. The mother had deactivated L.Y.'s Facebook account. But L.Y. had reactivated the account. The mother denied the maternal grandmother ever physically abused L.Y. The mother described her altercation with Sean as not involving physical hitting. The mother stated Sean grabbed her and choked her. She stated L.Y. witnessed only one incident of physical abuse involving Sean. This was the incident involving the banging on the pan early in the morning.

The maternal grandmother denied seeing the mother strike L.Y. The maternal grandmother denied physically disciplining L.Y. Sean testified he grabbed the mother on the morning of his arrest to get her out of the room. He stated L.Y. witnessed the fight. According to Sean, L.Y. screamed and was bothered by the incident. Sean stated he had no further problems with the mother. He testified he never witnessed the mother strike L.Y. Once, he heard L.Y. crying. Sean asked the child what had happened. L.Y. explained she was spanked because she did something at school.

The juvenile court ordered L.Y. removed from the mother's custody. The juvenile court cited L.Y.'s statements that she feared returning home. The juvenile court also removed Aaron, finding a substantial risk of harm if he lived in the parents' home.

III. DISCUSSION

We review the juvenile court's jurisdictional findings and orders for substantial evidence. (*In re R.C.* (2012) 210 Cal.App.4th 930, 940–941; *In re E.B.* (2010) 184 Cal.App.4th 568, 574–575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; but see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard].) In terms of the different standards, as noted by our colleagues in the First District: "The practical differences between the two standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the

8

trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ."' [Citations.]" (*Id*. at p. 1351; accord, *In re C.B.* (2010) 190 Cal.App.4th 102, 123.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court. Issues of fact, weight and credibility are the provinces of the juvenile court. (*In re R.C.*, *supra*, 210 Cal.App.4th at p. 941; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

The mother does not contest the removal of L.Y. However, the mother argues Aaron should not have been removed. The mother contends: Aaron was situated differently than L.Y.; the juvenile court found the section 300, subdivision (j) allegation concerning sibling abuse did not apply; and Aaron never feared her.

As noted, the juvenile court sustained count A-1, which alleges the mother physically hit L.Y. with a cord. And count A-1 alleges L.Y. feared the mother. Section 300, subdivision (a) concerns an actual or substantial risk of serious physical harm to the child. The court also sustained count B-3, which alleges the children were exposed to the mother and Sean's violence. Section 300, subdivision (b) concerns an actual or substantial risk of serious physical harm to the child based on failure to adequately supervise or protect.

The evidence supports the conclusion that L.Y. was physically abused by the mother. The evidence also indicates L.Y. witnessed the mother and Sean's domestic violence incident in April 2012. The mother denied striking L.Y. with a belt or cord. But the mother admitted hitting L.Y. on the buttocks. L.Y. contradicted the mother's testimony concerning these spankings.

As to Aaron, the foregoing evidence supports the finding that he was at a substantial risk of serious physical and emotional harm. The evidence indicates the mother was physically and emotionally abusive of the older child. L.Y. stated she had concern for Aaron when he became older. The mother also minimized the abuse of L.Y., calling the youngster a liar. Additionally, domestic violence between the mother and

9

Sean occurred before L.Y. Neither parent has exhibited any maturity in dealing with the stresses of family life.

The mother relies on *In re Hailey T.* (2012) 212 Cal.App.4th 139, 149, in support of her argument distinguishing between L.Y. and Aaron. *Hailey T.* involved two siblings, one a three-year-old girl and the other a four-month old boy. (*Id.* at p. 142.) While the four-month-old was in his grandmother or parents' care, he suffered a right eye injury. (*Ibid.*) The boy was diagnosed with a subconjunctival hemorrhage which the specialist concluded was not accidental. (*Ibid.*) A juvenile court concluded the boy was a victim of intentional abuse and removed both children under section 300, subdivision (a). (*Id.* at p. 144.)

The appellate court reversed the removal order as to the girl. (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 149.) The Court of Appeal held there was no evidence: indicating the parents were engaging in ongoing domestic violence; had substance abuse problems; or suffered mental health issues. (*Id.* at p. 147.) The parents started utilizing services at the earliest opportunity, showed progress and had meaningful and productive visits with their children. (*Id.* at pp. 147-148.) There was no indication the parents ever inflicted physical harm on the girl. (*Id.* at p. 148.)

To begin with, *Hailey T.* is probably wrongly decided. Here is the state of the evidence regarding the cause of the four-month old boy's injuries: "When [the mother] checked on the children about 30 minutes later, she noticed the onset of a bruise on Nathan's right eye. [The father] noticed some redness on Nathan's left eyelid. [The father], who is CPR certified, used a flashlight to check if Nathan was tracking, and the infant's reactions seemed normal. Nathan was not upset or crying and, because of the late hour, the parents decided to wait until the next day to take him to a doctor. [¶] On February 15, the parents took Nathan to North County Health Services, where a doctor ran blood tests and scheduled a follow up appointment for the next morning to review the results. When the parents returned on February 16, they were told to take Nathan to Rady Children's Hospital's emergency room in San Diego for additional testing. Emergency room doctors diagnosed Nathan with subconjunctival hemorrhage to the right eye and

10

concluded his injuries were nonaccidental. A hospital hold was placed on Nathan, and when he was released from the hospital, he was taken to Polinsky Children's Center (PCC). Hailey also was detained at PCC. [¶] Jennifer Davis, M.D., a child abuse specialist, examined Nathan on February 17 at PCC and reported there was bruising to Nathan's right eye, on the eye ball, on the eyelid and underneath the eye. Nathan also had a bruise to his cheekbone under his right eye and petechiae around his left eye. Dr. Davis said these types of injuries are typically seen in strangulation cases, but because of the bruise on Nathan's cheek, she believed he most likely was struck." (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 142.) Thus, there was evidence the four-month-old boy was struck in the face in an excessively violent manner. Removal of a sibling under these circumstances does not appear to be an abuse of discretion. (See *Los Angeles Dept. County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 970 [abuse against a sibling may give rise to jurisdiction over a child].) We need not decide whether *Hailey T.* was correctly decided.

The facts here are in sharp contrast to those in *Hailey T.* Here, there was ongoing excessive discipline directed as L.Y. *Hailey T.* involved a single act of excessive force by parents who otherwise had a perfect parenting record. Unlike the parents in *In re Hailey T.*, the mother and Sean did have a prior incident of domestic violence. There is evidence the mother lacks self-control and allows other relatives to intimidate L.Y. Aaron is at risk if he remains in the mother's custody. Under these circumstances, the juvenile court's principled decision cannot be reversed.

11

## IV.  DISPOSITION

The November 20, 2013, dispositional order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


MOSK, J.


MINK, J.[*]


*     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.