Filed 7/27/21  In re Izaiah V. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re Izaiah V. et al., Persons Coming Under the Juvenile Court Law. | B308646 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.V. et al., <br><br> Defendants and Appellants. | Los Angeles County Super. Ct. No. 20CCJP03740A, B |

APPEALS from orders of the Superior Court of Los Angeles County, Emma Castro, Temporary Judge. Affirmed in part, dismissed in part.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant A.V.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant V.R.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

A.V. (father) and V.R. (mother) appeal from the court's jurisdiction findings and disposition orders declaring their son and daughter dependents of the court under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b).[2] The parents contend insufficient evidence supports the court's jurisdiction findings that their mutual domestic violence places the children at risk of physical harm. The parents also challenge the court's order removing the children from their custody, but that issue is now moot after the court returned the children to the parents' home at the first review hearing. As we explain, substantial evidence supports the court's jurisdiction findings. We therefore dismiss the challenge to the removal order and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Initiation of Dependency Proceedings

Mother and father have been in a relationship for about nine years, but they aren't married and don't always live together. They have two children: the son was born in 2017 and

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] In their appellate briefs, mother and father join in each other's arguments to the extent they are not inconsistent to each other's position.

the daughter was born in 2019. The family came to the attention of the Department of Children and Family Services (Department) in May 2020, after a referral alleged mother and father engaged in domestic violence on several occasions.

The first incident occurred in September 2019, after mother, father, and their son went to the beach. While they were walking to the car, mother and father got into an argument. Father started calling mother a " 'bitch' " and a " 'cunt' " in front of their son. Later, while mother was in the driver's seat of her car, father pulled her right hand off the steering wheel and said, " 'Fuck you stupid bitch, I fucking hate you, just wait until we get home.' " Father continued to scream at and belittle mother, causing their son to cry "uncontrollably."

Once they got home, father kept yelling at mother in front of the children. At one point, father told mother: " 'You are a stupid and worthless cunt just wait to see what I do to you.' " The son continued to cry and appeared "visibly frightened" of father. When the police arrived, the son was still "crying uncontrollably" and looked to be in a "great deal of stress and panicking."

Mother told the police that there were "numerous previous domestic violence incidents, but this was the first time it has been reported." Mother also told the police that father abuses OxyContin and other prescription drugs and he becomes "extremely violent" when he uses them. The police arrested father for child cruelty, but he was never prosecuted.

In January 2020, mother and father got into a fight at the maternal grandmother's home. Mother scratched father's neck, wrist, and knee, and she bit his chest twice. Father claimed mother woke him up while he was sleeping on the couch and started hitting him. Mother told the police that father had

attacked her, so she bit and pushed him to defend herself. The police arrested mother.

In May 2020, mother and father were staying at the paternal grandmother's home. When mother came home from work, father accused her of being drunk and started arguing with her. After they went into the bedroom, father told mother he didn't want her around the children while she was drinking, and he tried to take her car keys from her. Mother became upset, tried to take her keys back, and started striking father. She hit him with her open hands, scratching his arms and neck. She also bit his chest, leaving bite marks and a bruise. The police responded and arrested mother. In the police report, one of the responding officers noted that the children were inside the home while mother and father were fighting.

The Department interviewed the family in June 2020. Mother denied any incidents of domestic violence between her and father. Mother claimed the May 2020 incident was "nothing physical" and denied being under the influence of alcohol at the time. She accused the officers who responded to that incident of fabricating many of the details in their report, including one of the officer's statements that the children were home during the parents' dispute. According to mother, the children were staying with their maternal grandparents. When the social worker told mother that the police reports from the prior incidents contradicted her statements, mother replied, " 'you have the report, why do you need to ask me[?]' "

Father was also recalcitrant throughout his interview. He refused to discuss the allegations of domestic violence, aside from claiming the police lied about what occurred during the September 2019 and May 2020 incidents. When the social worker

explained that the Department was simply following up on an abuse referral, father replied, " 'do you have kids, has anyone come to your house, you sound like you're drunk.' "

The children's maternal grandfather told the Department that mother and father "fight over small stuff and their fighting is arguing," but he had never seen them engage in domestic violence. According to both maternal grandparents, the children were "with their mother" at the paternal grandparents' home during the May 2020 incident.

The Department also interviewed one of the officers who responded to the May 2020 incident. He confirmed that the children were with their parents at the time, but they did not witness the argument.

In July 2020, the Department tried to interview the parents again in person. Father filmed the conversation. Mother and father continued to accuse the Department of fabricating the domestic violence allegations. Father told the social worker, " 'the children are not abused, what the [social worker] is doing is bullshit, [the social worker] is a liar.' " Father refused to let the social worker take photographs of the children and, as the social worker was leaving, father said, " 'this is bullshit, I'm going to make a few calls, fuck him.' "

The Department filed a dependency petition on the children's behalf. The Department alleged mother and father have a history of engaging in domestic violence in front of the children, including the incidents in September 2019 and May 2020, which placed the children at serious risk of physical harm (§ 300, subds. (a) & (b); a-1 and b-1 allegations). The Department also alleged father is a current abuser of OxyContin and prescription medication and that mother failed to protect the

children by allowing father to be around them while abusing drugs (§ 300, subd. (b); b-2 allegation).

At the detention hearing, the court found father is the children's presumed parent. The court also found the Department alleged a prima facie case under section 300, subdivisions (a) and (b). The court detained the children from their parents' custody and granted mother unmonitored visits and father monitored visits with the children. The court also ordered the Department to provide the parents "predisposition" reunification services, including weekly drug testing and referrals to parenting and domestic violence programs.

## 2.     Jurisdiction and Disposition

The Department interviewed the family again in September 2020.

Mother blamed the police's involvement in the September 2019 incident on the children's maternal grandfather. According to mother, father had gotten drunk and began "talking out of his ass," so the grandfather called the police. Mother denied that father became violent or threatened her with violence. She also claimed the responding officers "lied" about her son being afraid of father. The children were not present during the incident, and the son only arrived when father was being arrested, which made the child upset.

Mother didn't want to discuss the January 2020 incident because she didn't "like to think about it." Mother admitted she bit father, but she only did so because he was "hugging [her] kind of tight" and she wanted him to stop. Mother claimed the children were with their maternal grandparents during the incident.

As for the May 2020 incident, mother couldn't remember "exactly what happened" because it was "a long time ago," but

6

she claimed no violence was involved. Father believed mother was drunk, even though she wasn't, so they began to argue. Mother denied hitting or biting father and told the social worker that father's bite marks were from a prior incident. According to mother, the children were staying with the maternal grandparents at the time of the argument. The police officer who responded to the incident simply assumed the children were with their parents.

Father told the Department he was arrested for "arguing" with mother during the September 2019 incident. He denied his son is afraid of him or that he caused his son to cry "uncontrollably," claiming the child only became upset once the police intervened.

Father acknowledged he and mother got "a little physical" during the May 2020 incident, but he claimed it was "not[h]ing crazy" and the police got involved only because his sister's partner called law enforcement. He denied mother had been drinking before their argument and told the Department that the children were with their maternal grandparents.

The paternal grandmother was home during the January and May 2020 incidents. She's never seen mother or father consume alcohol and claimed the parents usually "work well together," even though they will sometimes get into "loud" arguments. According to the grandmother, the children weren't present during either incident.

During the May 2020 incident, the paternal grandmother heard the parents arguing and slamming doors, but she didn't see them hit each other or call each other derogatory names. The grandmother did, however, see scratch and bite marks on father before mother called the police.

The maternal grandmother denied any history of domestic violence between the parents. She believed they simply have disagreements like any other couple. Although the maternal grandmother told the Department in June 2020 that the children were with the parents during the May 2020 incident, she now claimed the children had been with her during all the incidents.

The maternal grandfather had never seen the parents argue. He couldn't remember where the children were during the May 2020 incident, but he confirmed they were with the parents during the September 2019 incident. He claimed the children didn't witness the parents' argument, however, because they were in another room and the son only started crying once the police arrived.

As of early November 2020, mother and father were living in a new apartment, away from both sets of grandparents. Each parent completed a 16-hour parenting class. Mother was participating in individual counseling and had completed several sessions with a therapist. Father had enrolled in a domestic violence program and individual counseling, but the Department couldn't confirm whether he had started participating in either program.

The court held the jurisdiction and disposition hearing in November 2020. The court sustained the a-1 and b-1 allegations and dismissed the b-2 allegation.[3] The court declared the children dependents of the court, ordered them removed from their parents' custody, and awarded mother and father reunification services.

---

[3] As to the a-1 and b-1 allegations, the court struck from the petition language alleging father had been arrested for child cruelty.

Mother and father appealed the court's disposition orders.

In May 2021, the court returned the children to their parents' custody and ordered the Department to provide mother and father family maintenance services.[4]

## DISCUSSION

1. **Substantial evidence supports the court's jurisdiction findings.**

A court may exercise dependency jurisdiction over a child under section 300, subdivision (a), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally ... by the child's parent ... ." A court may also exercise jurisdiction over a child under section 300, subdivision (b)(1), if " '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child ... .' " (*In re R.T.* (2017) 3 Cal.5th 622, 624, 629, italics omitted.)

A child's exposure to his or her parents' domestic violence can support jurisdiction under section 300, subdivisions (a) and (b), if the parents' violence causes the child to suffer, or places the child at a substantial risk of suffering, serious physical harm. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 121–122.) Specifically, because domestic violence is nonaccidental, it can support jurisdiction under section 300, subdivision (a), even if the parents do not intend to direct their violence toward the child. (*Ibid.*)

---

[4] We take judicial notice of the May 4, 2021 minute orders attached to father's letter brief.

To show the child faces a risk of harm at the time of the jurisdiction hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.) In determining whether conduct is likely to recur, courts may consider evidence of the parent's behavior in the past. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) A parent's denial of wrongdoing or failure to recognize the negative impact of his or her conduct is also relevant to determining risk under section 300. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 735, fn. 4.)

We review jurisdiction findings and disposition orders removing a child from his or her parent's custody for substantial evidence. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.) We will affirm the findings if they are supported by evidence that is reasonable, credible, and of solid value. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*Ibid.*)

Substantial evidence supports the court's jurisdiction findings under section 300, subdivisions (a) and (b). The parents have an extensive history of domestic violence. In a span of less than nine months, they engaged in at least three incidents of violence, two of which were in front of the children or while the children were in the same home. And, when mother first reported

10

the violence in September 2019, she told the police that there had been "numerous previous [unreported] domestic violence incidents."

That the children were never physically harmed by the parents' violence does not diminish the risk that violence posed to them. For instance, father's conduct during the September 2019 incident was particularly dangerous. He physically attacked mother—pulling her hand from the steering wheel—while mother, father, and their son were in mother's car. It goes without saying that parents fighting while their child is inside a car with them poses a high risk of danger to the child. And, during the May 2020 incident, mother struck and bit father while the children were home. As numerous courts have explained, the nature of domestic violence in the home, by itself, poses a specialized risk to children. (See *In re R.C.* (2012) 210 Cal.App.4th 930, 941–942 [discussing cases that have held spousal violence puts children in a position of physical danger].) That's because the children " ' "could wander into the room where [the violence] was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg … ." [Citation].' [Citation.]" (*Ibid.*)

The parents' behavior throughout the Department's investigation also supports the court's jurisdiction findings. The parents refused to cooperate with the Department's social workers when the investigation began, belittling and cursing at them. The parents also often denied they ever engaged in violent behavior, and, when confronted with contradictory statements they had made in the past, they accused others, including the responding police officers, of fabricating details about their violent altercations. Based on the parents' obstructive, flippant,

11

and dishonest behavior throughout the Department's investigation, it was more than reasonable for the court to conclude mother and father were unlikely to resolve their issues with domestic violence without the court's intervention. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].)

The parents contend that even if their past violence created a risk of harm to the children, that risk no longer existed by the time of the jurisdiction hearing. Specifically, they point to evidence that they moved into their own apartment before the hearing, completed parenting classes, and enrolled in individual counseling and a domestic violence program. We fail to see how the parents moving into their own apartment would have tipped the scale toward decreasing the risk of harm to the children. The record is replete with instances of the parents fighting while they were together. (See *In re E.B.* (2010) 184 Cal.App.4th 568, 576 [" '[p]ast violent behavior [between parents] in a relationship is "the best predictor of future violence" ' " and an indicator that violence will recur], disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) And, by the time of the jurisdiction hearing, there was no evidence that either parent had started participating in their domestic violence program. While the parents have evidently addressed the issues that led to the court removing the children from their custody, the court reasonably could have found that, at the time of the jurisdiction hearing, the parents had yet to adequately resolve those issues.

## 2. The parents' challenge to the removal order is moot.

" ' "A judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition. … An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." ' " (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) " 'An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.]' [Citation.]" (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498 (*Anna S.*).)

As we explained above, the court returned the children to mother's and father's custody while this appeal was pending. Although the court's disposition orders removed the children from their parents' custody *and* required mother and father to participate in court-ordered case plans, the parents only challenge the court's decision to remove the children from their custody. They do not challenge any aspect of their case plans. And, while the parents argue their challenge to the removal order is not moot, they don't identify any specific negative consequences that could flow from leaving that order undisturbed. Because the juvenile court's May 2021 orders returning the children to mother's and father's custody has provided the parents all the relief they seek through their challenge to the removal order, that challenge is moot and we dismiss it as such. (See *Anna S., supra,* 180 Cal.App.4th at p. 1498.)

## DISPOSITION

The portion of the appeals challenging the removal order is dismissed. The disposition orders and jurisdiction findings are otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P.J.

WE CONCUR:

EGERTON, J.

KALRA, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.