Filed 7/29/21

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re L.O., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.O.,<br><br>Defendant and Appellant. | E075921<br><br>(Super.Ct.No. J285639)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed as modified.

Elizabeth A. Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Jodi L. Doucette, Deputy County Counsel, for Plaintiff and Respondent.

L.O. (Father) and Z.T. (Mother) are the parents of six-year-old L.L.O. (L.), a boy born in December 2014. Father appeals from the juvenile court's October 7, 2020 jurisdictional and dispositional orders adjudicating L. a dependent of the court (Welf. & Inst. Code,[1] § 300, subds. (b) & (d)) and removing L. from parental custody (§ 361, subd. (c)(1)).[2] Father contends that there was insufficient evidence to support the juvenile court's findings sustaining the petition against him under section 300, subdivisions (b) and (d) and the order removing L. from his custody. We find substantial evidence supports the juvenile court's finding under subdivision (b) of section 300 and the order removing L. from Father's custody. We, however, agree insufficient evidence supports the court's finding under section 300, subdivision (d), and modify the order to strike the allegation under that subdivision. The order is affirmed in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

In June 2020, the San Bernardino County Children and Family and Services (CFS) received a referral alleging physical abuse, emotional abuse, and general neglect of L., after L. reported to Father that Mother's boyfriend, G.B., had physically abused him. L. had marks and bruises on his lower back, right eye, and buttocks, and a cut on the bottom of his left foot. The parents shared joint custody of L. and a court order was issued to not hit L. Father explained that he, Mother, and G.B. had been in a physical confrontation where restraining orders were sought. L. was born with a condition called Fanconi

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother is not a party to this appeal.

anemia and was small for his age and vulnerable to illnesses and diseases. L. also disclosed that G.B. hit Mother too, and that G.B. often showed L. his guns.

When law enforcement responded to the referral, officers observed the various marks and bruises on L. and took pictures. The officers also took pictures of belt loop marks on L.'s shins, circular bruises on the side of his face, and bruising on his buttocks. Father informed the officers that this was not the first time L. had returned to his home with suspicious bruises, but it was the first time he had reported it to CFS. Father also stated that L. displayed sexualized behaviors upon return from Mother's home, such as humping, moaning, and saying " 'oh yeah baby.' " Father denied that such sexual conduct was picked up from his home. Father admitted to using marijuana a year ago and drinking on occasion.

L. stated that Mother's boyfriend G.B. had hit him with a sandal and showed the social worker his marks and bruises. During the interview, L. had acted out the sexual behavior described above, humping things and kissing the mirror and walls for an extended period of time. L. would not disclose where he learned the sexualized behavior. He was also cussing, saying " 'F _ _ k. Shit. Bitch. N _ _ _ a.' " L. described Mother getting beat up by G.B. When asked if someone had told him not to talk to anyone about his bruising and marks, L. stated that "[M]om said she would hit me."

Mother generally blamed Father for L.'s injuries and noted that one of the injuries to L.'s eye had occurred at a party when he ran into a table. Mother claimed that when she picked L. up from Father's home, she saw bruising and marks on L.'s body "all the

time." Mother denied being beaten by her boyfriend. She noted that L.'s cussing was from an "app" Father had on his phone. She also denied engaging in sexual activity in front of L. and claimed L. had described Father and his girlfriend engaging in sexual acts. Mother had sought a restraining order against Father following an altercation between Father and G.B. during which L. was present in December 2019, but it was denied due to insufficient evidence.

L. later informed CFS that he had seen his father and girlfriend having sex and that he was mimicking what they did. Due to conflicting stories and alleged issues at both parents' homes, CFS removed L. from the parents' custody.

On June 22, 2020, CFS filed a petition on behalf of L. pursuant to section 300, subdivisions (a) (serious risk of harm), (b) (failure to protect), and (d) (sexual abuse). As to Father, the petition alleged: (1) L. was at substantial risk of serious harm due to Father's failure to adequately protect L. from physical harm (a-1); (2) Father had failed to protect L. from physical abuse by Mother and her boyfriend (b-3); (3) Father had a substance abuse problem (b-5); (4) Father had a history of engaging in domestic violence with his partners and that such ongoing violence in the home placed L. at risk of physical and emotional harm (b-6); and (5) Father had exposed L. to inappropriate sexualized behaviors and L. was acting out in a sexualized manner, thereby placing L. at risk of abuse and/or neglect (d-10).

At the detention hearing on June 23, 2020, Father appeared, denied the allegations, and submitted on detention. Father submitted on CFS's recommendations for placement

of L. with the paternal grandmother (PGM). The juvenile court formally removed L. from parental custody, maintained L. in his PGM's home, provided the parents with supervised visitation, and ordered the parents to drug test. The court also ordered L. to be assessed at the Children's Assessment Center (CAC) and ordered no contact between L. and Mother's boyfriend G.B.

CFS interviewed the parents again before the jurisdictional hearing. Father stated that he did not have a history of domestic violence, but noted that Mother had " 'socked' " him and " 'scratched [him] up pretty good' " about three to four years ago. He reported four or five incidents of domestic violence with the last incident occurring three years ago. Father also admitted that L. had been a witness to " 'lots of arguing and yes, three . . . times when it got physical.' " Father did not believe those incidents were domestic violence. Father admitted that L. shared a room with him and his girlfriend, but denied having sexual relations in front of L. Father noted that L.'s display of sexualized behavior was " 'almost as if he's watched porn.' " Father also stated he had not used marijuana for a month and a half but tested positive for marijuana when ordered to drug test by the court at the detention hearing.

When Mother was interviewed, she described the physical altercation in December 2019 involving Father and G.B. She noted that while L. was in her arms, she tried to stop the altercation between Father and G.B. She admitted that she and Father had been in other verbal and physical fights involving slapping. Mother believed that L. learned the sexualized behavior from Father, as L. says " 'baby' " when sexually acting

out and Father calls his girlfriend " '[b]aby.' " Mother explained that L. showed her what Father's girlfriend does to Father. She thus believed L.'s sexual conduct was learned at Father's house, especially since L. displayed behavior similar to real-life sexual acts.

The social worker interviewed L. over Facetime due to concerns for his special medical condition and susceptibility to harm from COVID-19. Without prompting while on the phone, L. blurted out that Mother's boyfriend " 'hurted' " him and " 'squished' " him hard. He also stated that Mother "got really hit." At one point, he puckered his lips, made kissing sounds, and said " '[o]h baby.' "

PGM reported that she saw L. dancing sexually and acting out sexual behavior. She opined that whatever L. was doing sexually, " 'he saw it.' " PGM also stated that she had to watch L. carefully because he acted out, cussed, and tried to choke his six-year-old cousin on two occasions. PGM further asserted L. informed her that Mother's boyfriend had hit him with a belt while Mother was watching, and told L. if he told, he would hit him harder.

Because drug use by both parents did not rise to a concerning level and no evidence existed of mental illness with Mother, CFS requested dismissal of those allegations (b-5, b-8, and b-9). In addition, because Father had recently tried to get custody of L. by reporting the physical abuse to the Family Law Court, and because he had reported the current abuse to CFS, CFS dismissed the willful failure to protect the physical harm allegations involving Father (a-1 and b-3). Prior to the jurisdictional hearing, CFS thus recommended dismissal of allegations a-1, b-3, and b-5 as to Father

and allegations b-8 and b-9 as to Mother. The remaining allegations pertaining to Father's conduct therefore included two allegations, namely b-6 (Father's history of engaging in domestic violence) and d-10 (Father exposing L. to inappropriate sexualized behaviors).[3]

Both parents essentially blamed the other parent and denied any wrongdoing themselves, while acknowledging L.'s injuries and sexualized behavior existed. CFS thus recommended L. be removed from parental custody and be maintained with PGM while the parents received reunification services until it could be determined L. was safe from sexual misconduct, domestic violence, and physical abuse.

The scheduled July 14, 2020 jurisdictional/dispositional hearing was continued to obtain the CAC report, which had not yet been completed. By August 11, 2020, the CAC report was completed, but without L.'s interview as he refused to go into the interview room. PGM continued to describe concerning behaviors by L., such as cussing, touching/patting his penis in front of people, two attempts to choke his six-year-old cousin, and not asking for Mother or Father. CFS noted L. was sexually advanced for his age and the parents could not agree on where and how L. was exposed to the sexual acts.

On September 28, 2020, CFS reported that L. had been having only video conferencing visitation with the parents and his sexual behaviors had reduced. L. told the

[3] The remaining allegations involving Mother were a-2 and b-4 relating to physical abuse by Mother's boyfriend, b-7 due to domestic violence with partners, and d-11 based on L.'s sexualized behavior.

social worker that he wanted to go back to Father's house because he did not want to return to Mother's boyfriend's home.

The contested jurisdictional/dispositional hearing was held on October 7, 2020. Father objected to the allegations and recommendations, but offered no witnesses or evidence and did not testify. L.'s counsel asked the juvenile court to find the allegations true as recommended. The court read and admitted all CFS reports into evidence. After hearing arguments from the parties, the court found true allegations b-6 and d-10 as to Father and allegations a-2, b-4, b-7, and d-11 as to Mother. The court declared L. a dependent of the court, removed him from parental custody, and provided the parents with reunification services. Father appealed.

## DISCUSSION

### A. JURISDICTIONAL FINDINGS

Father argues there is insufficient evidence to support the section 300, subdivisions (b) and (d) jurisdictional findings against him. Father does not challenge the allegations against Mother.

Initially, Father asserts the justiciability doctrine should not apply to this case because the juvenile court's jurisdictional findings as to him formed the basis for the dispositional order. He is also challenging the court's dispositional order.

#### 1. *JUSTICIABILITY DOCTRINE*

The juvenile court assumed jurisdiction based on findings against both Mother and Father, but Mother has not appealed, and Father does not challenge the jurisdictional

findings concerning her. CFS thus contends the jurisdictional determinations found as to Mother are sufficient to support jurisdiction over L. (See *In re Briana V.* (2015) 236 Cal.App.4th 297, 308 [" '[A] jurisdictional finding good against one parent is good against both.' "]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 (*I.A.*) ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

Under the doctrine of justiciability, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions. (*I.A., supra*, 201 Cal.App.4th at pp. 1490-1491.) "An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*Id*. at p. 1490.) "For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence" or is unchallenged. (*Id*. at p. 1492.)

On the other hand, an exception to this general rule has been recognized: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Generally, to acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result" of specified forms of parental neglect, including substance abuse, domestic violence, and failure to protect the child. (§ 300, subd. (b).) Findings that Father "knowingly or negligently" harmed the child or exposed him to a substantial risk of physical harm are "pernicious" and "could potentially impact the current or future dependency proceedings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 (*M.W.*).) The jurisdictional findings are also the basis for the dispositional order that Father challenges on appeal. We therefore will exercise our discretion to review the juvenile court's jurisdictional findings against Father.

2. *SECTION 300, SUBDIVISION* (*B*) *FINDING*

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)

Exposure to domestic violence may support jurisdiction under subdivision (b)(1) of section 300. (*In re R.C.* (2012) 210 Cal.App.4th 930, 941 (*R.C.*) [jurisdiction under subdivision (b)].) Jurisdiction under section 300, subdivision (b)(1), applies when a parent fails, or is unable, to protect the child from a substantial risk of serious physical harm because of exposure to domestic violence. (*R.C.*, at p. 941.) Jurisdiction is appropriate since a minor can be "put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194, abrogated on other grounds by *R.T.*, *supra*, 3 Cal.5th 622.)

"The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) " ' "[P]ast violent behavior in a relationship is 'the best predictor of future violence.' " ' " (*R.C.*, *supra*, 210 Cal.App.4th at p. 942; see *In re A.F.* (2016) 3 Cal.App.5th 283, 289 (*A.F.*) ["Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection"].)

Here, Father admitted that he and Mother had four or five incidents of domestic violence in the home. He also admitted that on more than one occasion Mother had " 'socked' " him and that Mother had " 'scratched [him] up pretty good.' " Father further admitted that L. had been a witness to " 'lots of arguing, and yes, three . . . times when it

got physical.' " He stated that he, Mother, and Mother's boyfriend had been in a physical confrontation where restraining orders were sought. Mother also described a physical altercation in December 2019 involving Father and her boyfriend, wherein she attempted to stop the altercation between the two men while she held L. in her arms. Mother further reported that there were times when things got physical and they would push each other while she and Father were still together. She explained that she and Father had been in other verbal fights and slapping matches. Father's admissions and Mother's statements amounted to substantial evidence that Father exposed L. to " ' "the substantial risk of encountering the violence and suffering serious physical harm or illness from it." ' " (*R.C.*, *supra*, 210 Cal.App.4th at p. 941.)

Father asserts the juvenile court lacked jurisdiction under section 300, subdivision (b), because the evidence does not indicate he had a history of engaging in domestic violence with his " 'partners.' " He also asserted the incidents involving Mother occurred three to four years ago and Mother ended her relationship with G.B., and thus there was no evidence L. would be exposed to further physical injury. These arguments are unpersuasive.

The mere "[e]xposure to domestic violence may serve as the basis of a jurisdictional finding under [this provision]." (See *R.C.*, *supra*, 210 Cal.App.4th at p. 941.) " 'Children can be "put in a position of physical danger from [spousal] violence" [by], "for example, . . . wander[ing] into the room where it was occurring and be[ing] accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." ' " (*Id*. at pp. 941-

942.) For that reason, a juvenile court may invoke jurisdiction under section 300, subdivision (b), even if a child has emerged physically unscathed from an instance of domestic violence. (See e.g., *R.C.*, at pp. 942-943, 945 [affirming the juvenile court's assertion of jurisdiction under section 300, subdivision (b), even though the child who witnessed a violent altercation "was not physically hurt"].)

Mother's separation from G.B. and the length of time between the last instance of domestic violence and the jurisdictional hearing do not undermine the juvenile court's assertion of jurisdiction under section 300, subdivision (b). "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*).)

Here, Father and Mother were still involved in an acrimonious family law matter and had domestic violence issues during custody exchanges. Moreover, L. was acting out violent conduct toward his six-year-old cousin. The record supports that L. faced an ongoing risk of harm based on Father's ongoing violent and contentious behavior when dealing with Mother. Therefore, the mere fact that CFS alleged "partners," rather than Mother, in the petition, and Mother and Father had separated does not establish that he no longer poses a substantial risk of serious physical harm to L. Indeed, even after Father had separated from Mother, he continued to engage in altercations with Mother in L.'s presence. Thus, notwithstanding the passage of time and the fact that Father and Mother

are separated and Mother is separated from G.B., Father's failure even to acknowledge his past violent behavior, let alone express remorse or show any insight regarding it, exposes L. to a risk that he will once again attack Mother in L.'s presence. (See *A.F.*, *supra*, 3 Cal.App.5th at p. 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' "]; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601 [parent's denial of domestic violence increases risk].)

Additionally, Father has expressed interest in having custody of, and an ongoing relationship with L. The juvenile court's orders in no way foreclose Father from achieving that objective, given that the court has declared that he is the presumed father of L., and provided Father and Mother with reunification services, including visits with L. Accordingly, Father will likely encounter Mother in L.'s presence in the foreseeable future. (See *R.C.*, *supra*, 210 Cal.App.4th at p. 940 [during the proceedings below, the juvenile court observed that because the mother and the father " 'still have three children together[,] [t]hey're still going to be interacting with each other' "].)

Father's efforts to align this case with *Daisy H.*, *supra*, 192 Cal.App.4th 713, *In re Jonathan B.* (2015) 235 Cal.App.4th 115 (*Jonathan B.*), and *M.W.*, *supra*, 238 Cal.App.4th 1444 are not persuasive. Each of the cases is factually distinguishable.

In *Daisy H.*, *supra*, 192 Cal.App.4th 713, the appellate court reversed a finding that the children were described by section 300, subdivisions (a) and (b), because the evidence showed that domestic violence between the parents last occurred "probably

seven [ ] years" before the dependency matter was filed, and there was no evidence any child had been exposed to domestic violence. (*Id*. at p. 717.) In *Jonathan B.*, *supra*, 235 Cal.App.4th 115, the mother lived apart from the father prior to the May 2014 domestic violence incident and immediately reported it to the police. (*Id*. at p. 117.) The only other domestic violence incident occurred five years prior. (*Ibid*.) Based on those facts, the Court of Appeal held there was no substantial evidence to support the jurisdictional finding against the mother under section 300, subdivisions (a) or (b)(1). (*Jonathan B.*, at pp. 119-121.) And in *M.W.*, *supra*, 238 Cal.App.4th 1444, the appellate court reversed jurisdiction based on domestic violence where the allegation was based on a single incident of domestic violence between the parents that had occurred more than seven years before the jurisdictional hearing and there was no other evidence of altercations between the parents. (*Id*. at p. 1454.) Here, unlike those cases, there were many more recent acts of violence which the court could reasonably find would likely continue. Jurisdiction against Father here was in the context of Father and Mother's historic failure to appreciate the dangers to L. from domestic violence and how their actions affected L.

Dependency jurisdiction is inherently fact-driven and the evidence must be viewed in its totality. We conclude there was substantial evidence to support the section 300, subdivision (b) jurisdictional finding against Father. (See *R.C.*, *supra*, 210 Cal.App.4th at pp. 943-944 [finding substantial evidence that the father's violence was ongoing in part because "[t]his case does not involve a single act which endangers a child" but instead

"involves two separate acts of domestic violence," one of which occurred "in the presence of one of the children"].)

3. *SECTION 300, SUBDIVISION* (*D*) *FINDING*

Under Section 300, subdivision (d), a child comes within the juvenile court's jurisdiction if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . or a member of his or her household, or the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d); see *In re D.C.* (2015) 243 Cal.App.4th 41, 51 (*D.C.*), superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.) As Father notes, Penal Code 11165.1 sets forth numerous enumerated offenses that constitute child sexual abuse, sexual assault, and sexual exploitation, with references to the Penal Code.

Penal Code section 11165.1, subdivision (a), provides that " 'sexual abuse' means sexual assault or exploitation" and lists a number of offenses that qualify as "sexual assault or exploitation." Most of the offenses listed involve physical touching, child trafficking/prostitution, or pornography. Penal Code section 11165.1, subdivision (b)(4), describes "intentional touching" as "[t]he intentional touching of the genitals or intimate parts . . . of a child, . . . for purposes of sexual arousal or gratification . . . ." The absence of physical evidence of sexual abuse does not preclude a finding of sexual abuse. (See *In re Jordan R.* (2012) 205 Cal.App.4th 111, 137 (*Jordan R.*).)

Here, there was no evidence that Father had inappropriately touched L. Rather, as alleged in the petition, the court found that Father had *exposed* L. to inappropriate sexualized behaviors and L. was acting out in a sexualized manner. Thus, as pointed out by Father, the only possible enumerated offense which can qualify as "sexual assault or sexual exploitation" under Penal Code section 11165.1 is child molestation as set forth in Penal Code section 647.6., subdivision (a). (See Pen. Code, § 11165.1, subd. (a).) That provision makes it a crime to "annoy[ ]" or "molest[ ]" any child under the age of 18. (Pen. Code, § 647.6, subd. (a)(1).)

" ' "Annoy and molest" ' " in the context of this provision are " 'synonymous and mean to disturb or irritate, especially by continued or repeated acts; to vex, to trouble; to irk; or to offend.' " (*Jordan R.*, *supra*, 205 Cal.App.4th at p. 135, citing *People v. Kongs* (1994) 30 Cal.App.4th 1741, 1749 (*Kongs*).) "The forbidden annoyance or molestation is not concerned with the child's state of mind, but rather refers to the defendant's objectionable acts that constitute the offense." (*People v. Lopez* (1998) 19 Cal.4th 282, 290.) The defendant's conduct must be " ' "motivated by an unnatural or abnormal sexual interest." ' " (*Id*. at p. 289.) Further, it must be conduct which would irritate or disturb a normal person. (*Id*. at p. 290.) "For the most part, Penal Code section 647.6 has been applied to incidents of explicit sexual conduct . . . . [¶] In some instances, however, the proscribed conduct was more ambiguous." (*Kongs*, at pp. 1747, 1750 [the defendant convicted of violating Penal Code section 647.6 on the basis of taking " 'crotch shots' " of fully clothed girls at public photo shoots].) "The deciding factor for purposes of a

Penal Code 647.6 charge is that the defendant has engaged in offensive or annoying sexually motivated conduct which invades a child's privacy and security, conduct which the government has a substantial interest in preventing and which is unrelated to the suppression of free expression." (*Kongs*, at p. 1752, italics omitted.)

In this case, as Father aptly notes, Penal Code section 647.6 is the only provision that could be possibly applicable given the allegations, the facts in this case, and the juvenile court's specific references to the terms "annoy" and "molest" in its ruling. Although the record demonstrates L. was acting out sexually and possibly witnessed Father engaging in sexual conduct with his girlfriend, there is no evidence in the record to support a finding that such an error or lapse was sexually motivated by Father, rather than an accident. There is no evidence Father had intentionally exposed L. to sexual conduct because Father was "motivated by an unnatural or abnormal sexual interest." (Pen. Code, § 647.6, subd. (a)(2).) L. denied that he had been sexually abused, and there is no evidence to suggest Father had intentionally exposed L. to sexual activities with his girlfriend. The social worker concluded several times that she did not know who or what L. had observed. There is also no evidence that Father had subjected L. to pornographic material, inappropriately touched L., or groomed L. (Cf. *In re D.G.* (2012) 208 Cal.App.4th 1562, 1567-1572 [the father offered the child money on several occasions and groomed the child for sexual favors]; *Jordan R., supra*, 205 Cal.App.4th at pp. 116-120, 137 [the father had wrestled with his niece on numerous occasions and then sexually abused her by asking her for a lap dance, kissing her, and asking for oral sex; the Court of

Appeal concluded that given the daughter's age, and the father's wrestling with her too, substantial evidence supported the finding the daughter was at risk of sexual abuse at the hands of her father when he "annoyed" or "molested" his niece].)

We have found no authority with similar facts as in the instant case—where a petition is sustained pursuant to section 300, subdivision (d), based on a child's sexualized behavior after having possibly witnessed a parent engaging in sexual activity with a significant other. Although Father may have *inadvertently* exposed L. to sexual conduct with his girlfriend, there is no evidence that he had *intentionally* exposed L. to the behavior. We note that "[a]llegations of child molestation are *serious*; they merit more than a rubber stamp. With the exception of death penalty cases, it is hard to imagine an area of the law where there is a greater need for reliable findings by the trier of fact. The consequences of being wrong—*on either side*—are too great." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1754.)

During oral argument, CFS's counsel questioned how jurisdiction could be established in these types of cases where a child is unintentionally exposed to sexual acts by a parent, the child is inappropriately acting out the sexual behavior, and the parent is aware of the child's sexualized behavior. We believe jurisdiction based on the facts in this case could have been established under section 300, subdivision (b). Indeed, pointing to *In re Rocco M.* (1991) 1 Cal.App.4th 814, abrogated by *R.T.*, *supra*, 3 Cal.5th at page 624, CFS's counsel's arguments related to the standard for substantial risk of harm under subdivision (b)(1) of section 300.

Jurisdiction under section 300, subdivision (b)(1), is proper if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . ." This language "authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for [his or] her failure or inability to supervise or protect [his or] her child." (*R.T.*, *supra*, 3 Cal.5th at p. 624.) A parent need not be " 'neglectful' " or " 'unfit.' " (*Id*. at p. 627.) Jurisdiction in the circumstances of this case where a child has witnessed a parent engaging in sexual acts and the parent is aware of the child acting out sexually could have been established under section 300, subdivision (b)(1). However, CFS did not allege jurisdiction under subdivision (b)(1) of section 300, but under section 300, subdivision (d). Jurisdiction under subdivisions (b) and (d) of section 300 are not the same.

Based on the evidence in this case, we cannot conclude substantial evidence supports the jurisdictional finding pursuant to Welfare and Institutions Code section 300, subdivision (d). There is no evidence that Father committed "sexual abuse" against L. under Penal Code section 11165.1 and Welfare and Institutions Code section 300, subdivision (d). We decline to find, as Father requests, that the section 300, subdivision (d) allegations in the petition based on L.'s exposure to sexual conduct, even if true, do not constitute sexual abuse pursuant to section 300, subdivision (d) as a matter of law. As the section 300, subdivision (d) allegation against Father is not supported by

the evidence and is not necessary to the court's findings of jurisdiction, we strike allegation d-10.

B. DISPOSITIONAL FINDINGS

Father also contends there was insufficient evidence to support removing L. from his custody and that there existed reasonable means to prevent removal of L. from his care. He believes that since he "has shown the jurisdictional findings and orders related to [him] are not supported by substantial evidence and must be reversed," the dispositional orders "must be dismissed as well." We disagree.

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) California law therefore "requires that there be no lesser alternative before a child may be removed from the home of his or her parent." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284; § 361, subd. (c)(1).) But, " ' "[t]he parent need not be dangerous and the minor need not have

been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, " 'bearing in mind the heightened burden of proof.' " (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.) Still, the appellant bears the burden of showing " 'there is no evidence of a sufficiently substantial nature' " to support the dispositional removal order. (*D.C.*, *supra*, 243 Cal.App.4th at p. 55.)

Here, substantial evidence shows that removing L. from Father's custody was necessary to protect L.'s physical and emotional well-being, and there were no other reasonable means by which L.'s well-being could be protected without removing him from Father's custody. (§ 361, subd. (c)(1).) Substantial evidence shows that, by the time of the October 2020 dispositional hearing, the parents could not agree who had caused the physical harm to L. or how L. had learned his sexualized behavior. Mother claimed that Father had caused the physical harm to L., and stated L.'s sexualized behavior was learned at Father's home. Father denied that L. had learned the sexualized behavior at his house and claimed L. had learned the behavior at Mother's home. He also denied that he had physically abused L. Therefore, without acknowledgement of the

perpetrator, L. remained unsafe in the custody of either parent. Moreover, PGM had reported that L.'s sexualized behaviors had decreased since he had been placed in her care. PGM also reported that L. used inappropriate language and tried to choke his six-year-old cousin. Until it was determined how or where L., who was five years old at the time, learned his inappropriate and alarming behavior, L. was at a substantial risk of serious physical harm if returned to Father's care. Thus, given L.'s high risk due to his age, developmental level, speech difficulties, medical needs, sexualized behaviors, and unexplained injuries, Father's ability to properly care for L. was in serious question by the time of the dispositional hearing. Substantial evidence supports the juvenile court's dispositional order removing L. from parental custody.

Father claims there were less drastic alternatives to removing L. from his care, including placing L. with him pursuant to a family maintenance plan. In support, Father points to mitigating factors such as his honesty and cooperation with CFS, his attempting to obtain a restraining order against G.B., his reporting the physical abuse allegations to CFS, and L.'s desire to live with Father. Although Father's actions are commendable and L. had stated he wanted to live with Father, we cannot ignore L.'s alarming behavior at such a young age. The record shows that L. had learned his inappropriate behaviors from either Father or Mother or both, and until it could be determined how he learned them, it was necessary to remove L. from Father's custody.

Father relies on *In re Henry V.* (2004) 119 Cal.App.4th 522 (*Henry V.*) and contends it is "on point." In that case, the appellate court reversed an order removing

from his mother's custody a four-year-old boy who had suffered first and second degree burns on his buttocks. (*Id*. at pp. 525-526, 529.) The appellate court characterized the abuse as "a single occurrence," noting that there was "ample evidence" of specific services available to "mitigate the risk of further physical abuse" and that there was no indication the juvenile court "understood the necessity of making the dispositional findings on clear and convincing evidence." (*Id*. at pp. 529-530.)

We disagree with the analysis in *Henry V.* that the removal was not supported by substantial evidence. The mother purposefully burned the toddler three times on the buttocks with a curling iron, and yet claimed she did not understand how the injury happened. (*Henry V.*, *supra,* 119 Cal.App.4th at pp. 525-526.) In our view, this was sufficient to support the juvenile court's order removing the child from his mother's care. In any event, *Henry V.* is factually distinguishable because L. was not subjected to a single incident, but rather a continuing risk of harm. Further, in this case, unlike *Henry V.*, the social worker had not suggested out-of-home placement of L. would be useful to secure Father's further cooperation.

Father also contends the juvenile court erred by failing to make required factual findings under section 361 before removing L. from his custody, and therefore "a new dispositional hearing is necessary to rectify this prejudicial error."

"At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical

health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; see § 361, subd. (c)(1).) The juvenile court is statutorily required to determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) It also must consider, "as a reasonable means to protect the minor. . . . [¶] (A) The option of removing an offending parent . . . from the home." (§ 361, subd. (c)(1).)

We agree with Father that the juvenile court's factual findings were deficient. It did not state any facts in support of removal or make any findings concerning reasonable means of preventing removal before removing L. from Father's custody. The court's minute order of the October 7, 2020 dispositional hearing "is not a replacement for a statement of the facts supporting the court's decision to remove a child from a parent's custody." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1067 (*D.P.*).)

However, "cases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held that the failure to do so will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' " (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) As explained in *D.P., supra*, 44 Cal.App.5th at p. 1068, this is because a removal order "is subject to the constitutional mandate that no judgment shall be set aside

'unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " "Under this mandate a 'miscarriage of justice' will be declared only when the appellate court, after examining the entire case, is of the opinion that ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Ibid*.) "Reasonable" probability means merely a reasonable chance that is more than an abstract possibility; it does not mean more likely than not. (*Ibid*.)

Based on our review of the entire record, and as discussed previously, we conclude it is not reasonably probable that the court would have found that L. could safely be returned home.

**DISPOSITION**

We strike allegation b-10 of the petition. As modified, the juvenile court's jurisdictional and dispositional orders are affirmed.

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.