Filed 7/3/23  In re K.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.V., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.E.,<br><br>Defendant and Appellant. | E079850<br><br>(Super.Ct.No. J292949)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

M.E. (father) contends there was insufficient evidence to support the juvenile court's jurisdictional findings under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j), regarding his child, K.V. (the child). Father argues those findings should be reversed, and the dispositional order should accordingly be reversed, as well. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2022, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, alleging that she came within subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The child was 11 months old at the time. The petition alleged that father had a history of engaging in domestic violence in the presence of the child, which placed the child at substantial risk of physical and/or emotional harm; that father was currently incarcerated; and that he had a prior dependency case. The other allegations under section 300, subdivisions (b) and (j), concerned the child's mother, K.N.V. (mother), who is not a party to this appeal.

In a detention report, the social worker reported that on December 14, 2021, the Child and Adult Abuse Hotline received a referral alleging general neglect after the police found mother unresponsive in her bedroom, with a methamphetamine pipe in her hand. The child was in a separate bedroom in her crib. Father arrived home from work,

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

took the child, and made arrangements to stay with the paternal grandmother (PGM). Father said he was aware of mother's methamphetamine use but it had been a long time since she used it.

On December 21, 2021, father spoke with a social worker and denied being aware of mother's methamphetamine use and said she had a methamphetamine pipe because they had just cleaned out their storage. He said they were currently attending Alcoholics Anonymous (AA) meetings, and mother told him she had a drink. He denied knowing how much alcohol she drank and said he had been gone for two days working. As to his prior dependency case in Los Angeles County, father said he was incarcerated when his son was born positive for methamphetamine. Father said he did not receive reunification services since he was incarcerated, mother failed reunification, and their son was put in a permanent placement.

On January 31, 2022, father called the social worker and told her he was at the police station to file a report due to several threatening phone calls he received that he believed were made on behalf of mother. He said a mutual friend told him that mother went to his house earlier in the day with two carloads of people to take the child from him. Father also said mother contacted him and tried to find out his whereabouts and told him there was "a surprise" in his mailbox. Father also stated that mother was filing a police report saying that he had hit her.

On February 15, 2022, the social worker spoke with father, who reported that when he was at the hospital, mother and a male friend came running in, and the male took off his shirt, started doing kicks in the air, and told him that as soon as mother got the

child, he was going to kick father's face in the concrete. Father said the police came and took a report. He said that mother had also been threatening the PGM, and the PGM got a restraining order against her.

On March 1, 2022, the social worker spoke with mother, who said she was going to live in a domestic violence shelter, and that she had a court date on March 15, 2022, to get a restraining order against father and a court date on March 30, 2022, regarding custody. Mother said she left father "to get away," and she denied the incident father said occurred where her friend threatened to kick his face.

The social worker spoke with father on March 9, 2022, and he said he was served with a restraining order from mother, but "the judge denied the order." Father said mother also tried to file another custody case to obtain full custody of the child, but the judge denied that case too and referred her back to the judge who was overseeing their current custody case.

On March 15, 2022, the social worker spoke with the PGM, who said she had no worries about father caring for the child, as he was a "good daddy." She said she helped father with the child. The social worker further reported that the referral was closed after it was determined that father had full custody, had appropriate support, and mother had supervised visits through family law.

The social worker reported that on March 17, 2022, another referral was received alleging general neglect and emotional abuse. The referral stated that father had full custody of the child, and mother was granted supervised visitation. Father went to pick up the child from mother, and mother "elbowed" the visitation monitor and "lunged" at

4

father. She did not hit father, and the child was not injured, but father did call the police. No arrests were made, and the child was released to father. Father called the social worker and confirmed that mother had a visit at the mall, and when he went to pick up the child, mother lunged at him and elbowed the monitor twice, while the monitor was holding the child. Father said mother handed the child to the monitor with one hand and elbowed her with the other, and since the monitor was falling on the sofa, he grabbed the child. The social worker talked with the visitation monitor, who said that when father came to pick up the child from the visit, mother saw him and "started yelling and went after [him]."

On March 21, 2022, father called the social worker to inform her that he had a probation hearing that day, and mother showed up and told the prosecutor that he had raped and hit her; so the judge ordered that father be arrested with no bail. Father said mother told the judge the incident occurred in January; however, mother was not in the home at that time. Father said he consented to his brother taking care of the child until he was released.

The social worker reported that there was a hearing in family law court on April 20, 2022, where the court ordered that mother have legal and physical custody of the child. However, the next day, on April 21, 2022, the police obtained a warrant and removed the child from the parents' custody.

The court held a detention hearing on April 26, 2022. Mother informed the court that she and father were never married, but they were living together when the child was

conceived and born. However, they stopped living together in December or January. The court detained the child in foster care and set a jurisdiction/disposition hearing.

*Jurisdiction/disposition*

The social worker filed a jurisdiction/disposition report on May 13, 2022, recommending that the court find the allegation that father had a history of engaging in domestic violence in the presence of the child not true. The social worker interviewed mother, who reported there was domestic violence in her relationship with father, but none of the incidents had been in the child's presence. Mother said there were two prior instances of domestic violence, but after the child was born, there had only been one, which took place when the child was at daycare.

The social worker reported that father had a criminal history, which included numerous drug convictions, as well as convictions in 2013 for inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)) and contempt of court/willful disobedience of a court order (Pen. Code, § 166, subd. (a)(4)), and a 2018 conviction for inflicting corporal injury on a spouse with a prior assault conviction (§ 273.5, subd. (f)(1)).

As to the allegation regarding father's prior dependency, the social worker attached evidence of the section 366.26 report from that case, which showed that a juvenile court sustained a section 300 petition in April 2017, finding true the allegations that father's criminal history, which included inflicting corporal injury on a spouse, and mother's substance abuse, placed the child's sibling, D.V., at risk of serious harm. Father was ordered to comply with all criminal court orders and to participate in a drug rehabilitation program, drug and alcohol counseling and testing, and individual

6

counseling. In November 2018, the court found that father made minimal progress and terminated his reunification services. The social worker recommended terminating parental rights and adoption by the child's grandparents.[2]

The court held a hearing on May 17, 2022, and the court continued the matter to allow father to be interviewed.

The social worker filed an addendum report on June 9, 2022, recommending that the court return the child to father's custody on family maintenance and order reunification services for mother. The social worker interviewed father and reported that he said there was no domestic violence in any of his relationships other than "what he had just went through with the mother." He reported an incident where mother threw bricks through the window of his home, tried to steal his car, and called the police to make false allegations. Father denied that he had ever put his hands on mother and said her accusations were a lie. Upon further questioning, father said he was currently on probation due to a false allegation made by mother in 2017 that he hit her. He said the police believed her over him and arrested him. Father said he was convicted of domestic violence, and his probation was set to end in July 2022, but was now extended due to his recent incarceration.

---

[2] The documents attached to the jurisdiction/disposition report did not include what transpired at the section 366.26 hearing. However, father testified that his parental rights were terminated as to his son.

Father reported that the conditions of his probation required him to complete community service and a 52-week domestic violence program. He said he had completed the community service and 32 classes of the domestic violence program.

The social worker further reported that prior to detention, a safety assessment was performed, and father's home was deemed safe. The social worker stated there were currently still no safety concerns regarding his home. Furthermore, the social worker stated that the allegations of domestic violence were in the past, and father had not had any recent incidents of domestic violence where he was the aggressor. The social worker further reported that since father had been ordered to complete a domestic violence program on probation, there was no need to order additional services.

The social worker attached a copy of the family law temporary court order, granting father legal and physical custody of the child, which was filed on or about January 19, 2022.

The court held a further jurisdiction/disposition hearing on June 9, 2022. It was reported that the child was no longer with the paternal uncle but was now in a licensed foster home. Counsel for the child indicated he did not agree with the recommendation to return the child to father's custody, and he set the matter contested. Father's counsel also set the matter for contest, seeking dismissal of the case. The court set the matter for July 13, 2022.

On July 11, 2022, the social worker filed Additional Information to the Court (CFS 6.7). She reported that a probation officer informed her that father was arrested and remanded into custody when he went into court on a regular progress report on March 21,

8

2022, and mother showed up in court and made allegations against him. A hearing was subsequently held, and the court found father in violation of probation due to violating a criminal protective order. Father was released from custody on May 31, 2022, and the court put him back on probation. The court also ordered a new protective order against father for mother.

The probation officer also reported that father had domestic violence cases in 2012[3] and 2018, and he was currently serving probation on the latter case. The officer noted that father had not completed his domestic violence classes, despite having three years to do so; however, his domestic violence classes were "re-issued," and he had since been making progress. Based on this information, the social worker concluded there was a factual basis for all the allegations, except the allegation under section 300, subdivision (g), that father was incarcerated. Thus, the social worker recommended that the court find the subdivision (g) allegation not true but find the others true and remove the child, place him in out-of-home care, and order that reunification services be provided to both parents.

On July 7, 2022, the court held a pretrial settlement conference. County counsel announced that CFS "may change the recommendation to find the (b)3 allegation true and offer family reunification services to Father as opposed to family maintenance, so Father should be prepared to proceed as if that may occur." She indicated she was waiting to receive father's records from Los Angeles County. Thus, the court vacated the

---

[3] The record actually shows his convictions were in 2013 and 2018.

July 13, 2022 date for the contested jurisdiction/disposition hearing and set another date for August 4, 2022.

On July 13, 2022, the social worker filed another CFS 6.7 report and attached copies of documents from the child's sibling's prior dependency case, including the petition that alleged father had a criminal history that included manufacturing/possession of a dangerous weapon, selling marijuana, possession of a controlled substance, and inflicting corporal injury upon a spouse.

The court held a pretrial settlement conference on July 15, 2022, and noted two CFS 6.7 reports were submitted that day, and the recommendation was changed to having the child removed and placed in out-of-home care, with services provided to father and mother. Counsel for the child agreed with the recommendation and withdrew his contest. The court then confirmed that the matter was only being contested by father and the contested hearing was set for August 4, 2022. The hearing was later continued to August 26, 2022.

At the hearing on August 26, 2022, father was called to testify. He testified that there had not been any domestic violence between him and mother in the presence of the child. When asked about his prior dependency case with regard to his son, father said he was in county jail for one and one-half years during the prior dependency, so he was unable to participate in reunification services. Father said that by the time he was out of custody, his son was already with the PGM, and he thought it would be best for her to adopt him and take care of him. Father then testified that following the methamphetamine pipe incident with mother on December 14, 2021, he immediately

took the child and stayed with his mother. He then went to family court to get full custody, and the family court issued him an ex parte grant of custody and temporary stay-away order for mother. Father testified that after the incident, he did not let mother have any unsupervised access to the child. When asked why he was recently incarcerated, father said mother showed up at his criminal proceeding and made false allegations that on some unspecified day in January 2022, that he was "domestically violent" toward her. However, father testified that mother was never in his house in January.

Father further testified that on March 21, 2022, mother alleged domestic violence at his probation progress hearing, and he was remanded into custody until June 1, 2022.

When asked when the last domestic violence incident between him and mother took place, father testified that it was when he was convicted in 2018. However, that incident did not take place in front of the child since she was born in 2021. Father also testified that he was falsely accused at that time, and that he had never hit mother. Counsel asked if he had ever been convicted of domestic violence prior to the 2018 case, and father said he was charged with domestic violence for an argument with his ex-girlfriend, but he said the charge was reduced and he was convicted of "verbal assault."

Father testified that he was not currently in a relationship with mother. On cross-examination, he testified that mother had a restraining order against him after the 2018 case, but it was amended to a peaceful contact order.

Father testified that he was currently on probation and had completed 27 of his 52 domestic violence classes. He said it took him "a couple years" to complete those classes because of his health issues.

11

County counsel questioned father and asked, "Your testimony today is that you have never engaged in domestic violence with Mother; is that correct?" Father responded, "That's incorrect. I have never engaged with any type of domestic violence with Mother in the presence of any minor. If you're talking about the charge, I have never physically engaged in domestic violence, physical violence. Now, of course, we've been together four, five years. We had an argument here and there. However, to the effect that you're asking, the question have I been domestically violent, no." When asked about domestic violence incidents that occurred outside the presence of a minor, father explained that he and mother had just had "common arguments . . . couples go through."

During closing arguments, father's counsel requested the allegations against father in the petition be dismissed. County counsel moved to dismiss the allegation under section 300, subdivision (g) [father was incarcerated and not able to care for the child], but asked the court to find the other allegations true.

After reviewing all the evidence, the court noted that father adamantly denied a history of domestic violence, and it questioned his credibility due to inconsistencies in statements made during his testimony, compared to statements previously made to the social worker. The court observed that father repeatedly blamed mother for every incident of domestic violence, testified the allegations against him were false, and continued to minimize his domestic violence history. The court then noted a conflict in the evidence in that father testified he was recently remanded into custody on a probation violation due to mother's false allegation that he was "domestically violent" with her in January. However, the detention report stated that father told the social worker mother

12

showed up at his criminal hearing on March 21, 2022, and told the judge he had raped and beat her; then the court ordered him to be arrested on a probation violation without bail. The court further remarked that mother's allegation was not just an incident involving domestic violence, but also rape. The court also observed that in the jurisdiction/disposition report, father said there had been no domestic violence prior to mother moving out of the home; yet he had criminal convictions for inflicting corporal injury on a spouse in 2013 and 2018. The court further mentioned that father was in violation of restraining orders by maintaining contact with mother shortly before their older child was born and when the child was conceived.

Therefore, as to the allegations in the section 300 petition regarding father, the court modified the subdivision (b) allegation to conform to proof and struck the words "in presence of the child." The court then stated, "The allegation found true is that [father] has a history of engaging in domestic violence which places the child at substantial risk of physical and/or emotional harm." The court also modified the subdivision (j) allegation to conform to proof to state that father had a prior dependency and failed to make substantive, reasonable efforts to address the issues that led to removal of the child's sibling,[4] which placed the child at risk of similar abuse or neglect. The court dismissed the subdivision (g) allegation that father was incarcerated.

Regarding disposition, father requested family maintenance, while the child's counsel asked for reunification services. The child's counsel pointed out that father

---

[4] The court stated the prior dependency concerned the child's half sibling; however, the record shows he had the same parents as the child.

13

continued to minimize his role in domestic violence, despite his convictions; that father had not made progress in his domestic violence program, despite having three years to complete it; and that he split up with mother but always went back to her. Furthermore, father had a domestic violence relationship with a prior girlfriend. County counsel noted that this was a possible no-reunification case, but CFS agreed to offer services to both parents. The court observed that defendant had repeatedly minimized his domestic violence history and blamed it on mother for making false accusations. It noted there was "a history of going back and forth" between father and mother, and observed that it was clearly "not a healthy relationship between the two of them if she's always making false allegations which land [father] in custody." The court was also concerned with whether father would follow the court's orders and noted that he and mother had previously violated a restraining order. The court noted he was still on probation for the domestic violence case, in which he had only completed 27 of 52 sessions of his program, and it was concerned that if he failed to complete the components of that case, he could end up incarcerated and unable to care for the child. The court ultimately declared the child a dependent, removed him from father's and mother's custody, and ordered reunification services.

DISCUSSION

I. The Court Properly Took Jurisdiction of the Child

In sustaining the jurisdictional findings alleged, the juvenile court effectively determined that the child was subject to its jurisdiction because there was a substantial risk she would suffer serious physical harm or abuse due to father's domestic violence

14

history and failure to make substantive efforts to address the issues that led to the removal of the child's sibling. (§ 300, subds. (b) & (j).) Father argues there was insufficient evidence to support the court's findings under section 300, subdivisions (b) and (j), pointing out that the court struck the language in the domestic violence allegation that said, "in the presence of the child" and asserting that both allegations concerned events that occurred prior to the child being born. Thus, he contends the child was not at substantial risk of harm at the time of the jurisdiction hearing. We conclude the court properly took jurisdiction of the child.

A. *Standard of Review*

"The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to all appeals. If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citations.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333-1334 (*Christopher L.*).)

B.  *The Evidence Was Sufficient to Support the Section 300, Subdivision (b)*

*Finding*

Section 300, subdivision (b), provides that the juvenile court may adjudge a child a dependent of the juvenile court when the child has suffered, or there is a substantial risk that the child will suffer, serious harm or illness, as a result of "[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" or "[t]he willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." "The standard of proof required in a section 300 dependency hearing is the preponderance of evidence." (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 168.)

"Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, 'and to ensure the safety, protection, and physical and emotional well-being of *children who are at risk of that harm*.' [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citations.] The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*).) "Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [Citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior." (*Ibid.*)

16

Here, the amended petition alleged that father had a history of engaging in domestic violence that placed the child at substantial risk of physical and/or emotional harm. Although there was certainly evidence to the contrary, there was substantial evidence to support this allegation. The social worker interviewed mother, and she reported there was domestic violence in her relationship with father. Further, the evidence showed that father had a 2013 conviction for inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)) and a 2018 conviction for inflicting corporal injury on a spouse with a prior assault conviction (§ 273.5, subd. (f)(1)). Moreover, the evidence showed that father was charged with domestic violence regarding an argument with his ex-girlfriend, although he said the charge was reduced and he was convicted of "verbal assault."

Father argues his history of domestic violence did not affect the child since the child had not been born when the incidents occurred, he had not physically harmed the child, and there was no evidence he was engaging in ongoing domestic violence at the time of the jurisdiction hearing. However, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Domestic violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b), when "there is evidence that the violence is ongoing *or likely to continue* and that it directly harmed the child physically or placed the child *at risk* of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, italics added, disapproved on other grounds, as stated in *In re D.P.* (2023) 14 Cal.5th 266, 277-278; see *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993

17

["there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' "].) We acknowledge this is a close case since there appears to be no evidence that father was currently engaging in domestic violence or that he had engaged in domestic violence in the presence of the child. The court realized such and struck the words "in presence of the child" from the allegation to conform to proof. However, the court could not ignore the fact that father had two criminal convictions involving domestic violence, and past harmful conduct is relevant to the current risk of future physical harm to a child. (*In re David M.* (2005) 134 Cal.App.4th 822, 831 ["past abuse or neglect can certainly be an indicator of future risk of harm"]; see *T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior"].)

Moreover, as the court noted, father adamantly denied a history of domestic violence and repeatedly blamed mother and testified that all the domestic violence incidents were just false allegations. However, father's denial came in the face of the two domestic violence convictions. His denial and minimization of his domestic violence history are very concerning because "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 (*Gabriel K.*); see *In re A.F.* (2016) 3 Cal.App.5th 283, 293 (*A.F.*) [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].)

We further note that father's denial of the domestic violence makes him "likely to be resistant to therapy or treatment necessary to effect behavioral changes to [e]nsure the [child] will not be [at] risk if placed in his custody." (*In re Esmeralda B.* (1992) 11

18

Cal.App.4th 1036, 1044.) Notably, the record shows father was ordered to complete a 52-week domestic violence program as part of his probation from the domestic violence conviction in 2018. However, as of the August 26, 2022 hearing, he had only completed 27 out of the 52 classes, and he said he took "a couple years" to complete those 27 classes. Given his denial of ever "put[ting his] hands on" mother and his failure to complete the domestic violence program despite having ample time to do so, it is reasonable to infer that father does not see the need to modify his behavior in the future.

In addition, father's testimony that he had never engaged in domestic violence is evidence that he lacked insight regarding the risk of harm created by his past conduct. (See *In re L.O.* (2021) 67 Cal.App.5th 227, 240 ["Father's failure even to acknowledge his past violent behavior, let alone express remorse or show any insight regarding it, exposes L. to a risk that he will once again attack Mother in L.'s presence."].) We note the court found father to be not credible and believed he did have a history of domestic violence, despite his denials and in view of his criminal convictions. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*) ["Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court."].)

Although father testified he was not currently in a relationship with mother, his claim did nothing to reduce the risk of harm since it appears he and mother were still involved in an acrimonious family law case and still saw each other during visitation exchanges. (*In re R.C.* (2012) 210 Cal.App.4th 930, 940 [when parents have children together " '[t]hey're still going to be interacting with each other' "].) The record shows a

19

recent incident at a visitation at the mall when mother attacked the visitation monitor who was holding the child. Then, while father was holding the child, mother lunged at him to try and get her, which placed the child at risk. Although father was not the perpetrator in that incident, the nature of the interaction between him and mother, in the presence of the child, demonstrated the present risk of harm to the child as such acts could result in further mutual domestic violence. As the court opined, father and mother did not have a healthy relationship, as she made allegations (which he claimed were all false) that resulted in him being found in violation of his probation and being remanded into custody.

Father also focuses on the fact that CFS initially recommended the allegation regarding him having a history of domestic violence be found not true. He points out that CFS investigated its concerns and made that recommendation, but "when [he] pushed the limits and wanted the petition dismissed, the Department changed its position." Father asserts that nothing had changed in CFS's investigation when "at the last minute" it changed its recommendation. We observe the social worker recommended that the court find the allegation that father had a history of engaging in domestic violence "*in the presence of the child*" to be not true, apparently because the evidence showed his domestic violence convictions were from 2013 and 2018, before the child was born. However, the court struck the words "in the presence of the child" before finding the allegation true. We also note that, contrary to father's characterization that the social worker changed its recommendation "at the last minute," county counsel informed the

20

court and the parties ahead of time that CFS may change its recommendation, as it was waiting to receive records from Los Angeles County.

Ultimately, we must draw all reasonable inferences in support of the juvenile court's findings and view the record most favorably to its order. (*Christopher L.*, *supra*, 143 Cal.App.4th at p. 1333.) The court could reasonably conclude that domestic violence was likely to continue, in light of father's prior convictions, persistent denials, lack of insight or remorse, and lack of progress in his domestic violence program. (See *T.V.*, *supra*, 217 Cal.App.4th at p. 133; see also *Gabriel K.*, *supra*, 203 Cal.App.4th at p. 197, *A.F.*, *supra*, 3 Cal.App.5th at p. 293.) Accordingly, we conclude the evidence was sufficient to support the court's section 300, subdivision (b) finding.

C. *The Juvenile Court's Jurisdiction May Rest on a Single Ground*

Father contends the evidence was insufficient to support the allegation under section 300 subdivision (j), with regard to his prior dependency case. He also argues that such case did not show the child was at substantial risk of current harm. We note that "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.) " '[S]ince the juvenile court's jurisdiction may rest on a single

21

ground,' " we need not consider father's claim with regard to section 300, subdivision (j).[5]  (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.)

## II.  The Court's Dispositional Order Was Proper

Father asserts that reversal of the jurisdictional ruling makes the court's disposition order moot.  He also contends the dispositional order regarding him was "not designed to eliminate the conditions that led to dependency, since it was primarily mother's conduct that brought [the child] to the attention of the Department."  We conclude the evidence supports the court's dispositional order.

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal."  (*T.V.*, *supra*, 217 Cal.App.4th at p. 135.)  "*The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate*.  The focus of the statute is on *averting harm* to the child.  [Citation.]  We review the court's dispositional findings for substantial evidence."  (*Id.* at pp. 135-136, italics added.)

---

[5]  We do note that county counsel told the court this was a possible no-reunification case (presumably under § 361.5, subd. (b)(11)), but CFS agreed to offer services to both parents.  The court then modified the section 300, subdivision (j) allegation to state that father had a prior dependency and failed to make reasonable efforts to address the issues that led to removal of the child's sibling, which placed the child at risk of similar abuse.

As discussed previously with respect to the court's jurisdictional findings, substantial evidence supports the court's findings that the child remained at risk of harm in father's care. Father completely denied a history of domestic violence and blamed mother for making false allegations, despite the fact that he had two domestic violence convictions. (See § I.B., *ante*.) The court was properly concerned about his denial and minimization of his domestic violence history. (*A.F.*, *supra*, 3 Cal.App.5th at p. 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].) The court was also properly concerned with whether father would follow its orders, since the evidence showed that he and mother violated a restraining order and he had only completed 27 of 52 sessions of the court-ordered domestic violence program, despite having three years to do so.

We conclude that the court's decision to remove the child was consistent with the purpose of section 361, subdivision (c), which is to prevent harm to children. (*T.V.*, *supra*, 217 Cal.App.4th at p. 136.) We accordingly affirm the dispositional order.

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
                                                          J.

We concur:

SLOUGH
          Acting P. J.

MENETREZ
          J.